# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **IVAN EBERHARDT**, | * | |
| Petitioner, | * | Civil No. |
| v. | * | Orig. Crim. No. 98-CR-946 |
| **UNITED STATES OF AMERICA**, | * | |
| Respondent. | * | |

## MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
## UNDER 28 U.S.C. § 2255

_____COMES NOW, the Petitioner herein, Ivan Eberhardt[1], by and through undersigned counsel, and moves this Honorable Court to vacate and correct the sentence heretofore imposed based upon clear, uncontroverted, and egregious violations of constitutional protections, specifically Fifth Amendment violations of substantive and procedural due process and substantive and prejudicial Sixth Amendment violations reflected in the ineffective assistance of counsel.  In support hereof, the Petitioner states the following:

### _Procedural History_

1)      Ivan Eberhardt (herein referred to as "Petitioner") was originally charged with a two count Indictment, alleging he had conspired to possess cocaine with intent to distribute in violation of 21 U.S.C. §846, and distributed cocaine in violation of 21 U.S.C. §841(a)(1).

---

[1]While Petitioner was indicted, tried, and ultimately convicted under the spelling "Ivan Eberhardt," most of the post conviction pleadings refer to the him as "Ivan Eberhart." While some might suggest that such a variance evidences a _per se_ violation of counsel's effective assistance, suffice it to say that current counsel will utilize the spelling found in the original charging instrument.

2)    On April 3, 2002, Petitioner was convicted by a jury of conspiring to distribute cocaine in violation of 21 U.S.C. § 846 and acquitted of distributing cocaine in violation of 21 U.S.C. § 841(a)(1).

3)    Petitioner subsequently and timely moved for acquittal notwithstanding the verdict or, in the alternative, a new trial. That motion alleged one error on which the Petitioner believed a new trial should be granted. In a supplemental memorandum, filed after the Rule 33 new trial deadline, the Petitioner alleged two additional errors. The government did not object to the timeliness of these two additional grounds. The district court granted the motion for a new trial based on all three grounds. On appeal, the government argued that the district court lacked jurisdiction to consider the two grounds raised in the supplemental memorandum, since Rule 33's time limits had expired at the time that memorandum was filed. The Seventh Circuit Court of Appeals agreed. United States v. Eberhart, 388 F.3d 1043, 1049-50 (7th Cir. 2004).

4)    The Supreme Court granted certiorari, and held that Rule 33's time requirements are non-jurisdictional "claim processing rules," and may be forfeited if not properly contested in the district court. Eberhart v. United States, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005) (*per curiam*). The Court remanded the case so that the circuit court could consider the government's appeal with the knowledge that the district court had jurisdiction to review all three claims absent a government objection.

5)    The Seventh Circuit reversed the trial court's decision to grant a new trial, finding that none of the grounds presented by the defendant provided a sufficient basis for the district court to grant a new trial. United States v. Eberhart, 434 F.3d 935 (7th Cir. 2006), cert. denied, No.

06-5233, 127 S. Ct. 228, 166 L. Ed. 2d 181, 2006 U.S. LEXIS 5597, 2006 WL 1981739 (Oct. 2, 2006).

6)  The district court then sentenced the Petitioner to 135 months in prison. From that final judgment, an appeal was taken again to the Seventh Circuit. The conviction and sentence were affirmed upon appellate review. United States v. Eberhart, 467 F.3d 659 (7th Cir. 2006), *reh'g denied by, reh'g, en banc, denied* by United States v. Eberhart, 2006 U.S. App. LEXIS 31404 (7th Cir. Ill, Dec. 15, 2006); U.S. Supreme Court *certiorari denied* by Eberhart v. United States, 2007 U.S. LEXIS 7754 (U.S., June 18, 2007)

### *Factual History*

7)  Just as the procedural history of this case is anything but simple and direct, the Government's misunderstanding and perception of the underlying facts which serve to support this case are anything but straightforward.

8)  On December 16, 1998, Federal Drug Enforcement Agency ("DEA") Agents Daniel Foley and Robert Glynn arrested Charles Bolden after inducing him to sell two kilograms of cocaine to a government informant. (Tr. 39-52). Once arrested, Bolden cooperated with the DEA, agreed to help apprehend his supply source, who he identified as "E" and who the agents later identified, over objections as to hearsay, as Eberhardt. (Tr. 53).

9)  At the agents' direction, Bolden made several calls to Eberhardt to arrange for a taped meeting at which Bolden sought to elicit incriminating statements and to arrange a drug deal.. While Bolden was able to get the meeting requested, and taped by the DEA agents, he was never able to effect any such deal with the Petitioner, nor to elicit any incriminating remarks. (The taping was by microcassette and not by any "real time" technology so that the agents

3

did not hear the complete conversations until after the fact.) During the course of these conversations, Bolden and Eberhardt discussed passing matters, remarks one would at best refer to as colloquial and off-color, yet in no way incriminating. At one point, Bolden, as if he were speaking to himself, with no antecedent or foundation, discussed a mysterious debt. "I owe you," Bolden said in a one-way conversation, most probably for the agent's benefit.

10)     Notwithstanding the lack of substance to the conversation, the DEA agents arrested Petitioner. No drugs nor other indicia of drug dealing were found nor seized from the Petitioner.

11)     After finding no indicia of criminal activity, the agents took Petitioner to the DEA offices while Petitioner repeatedly denied any criminal activity. After hours of interrogation fielding nothing, the agents informed Petitioner that unless he cooperated he would not see his children on Christmas, he would be held indefinitely at the Metropolitan Correctional Center, and he would not be able to afford an attorney. Petitioner inquired what he needed to do to cooperate and he was told to simply show the DEA a drug house. He pointed out a garage which he thought might be a drug house. They further asked Petitioner if he knew of anyone who sold drugs. He told the agents that he did but did not have any telephone numbers with him. Petitioner was then sent home. The following morning, Petitioner met these agents and supplied a telephone number (which had been supplied to him by friends). The number, to someone Petitioner only knew as "Tommy", bore no fruit according to the DEA agents.

12)     By the time he surrendered back to the Government the following week, as required, the DEA had prepared an affidavit claiming that the Petitioner affirmed that he had confessed

to delivering two kilograms on December 15, 1998 to Charles Bolden, the government informant.[2]

13) Under pressure from the DEA agents, the Petitioner agreed to provide information to the agents. Eberhardt gave the agents a physical description of the aforementioned "Tommy", his cellular and pager phone numbers, and the location of a "stash house" out of which Tommy operated. At the agents' direction, the Petitioner, acting as an undercover informant, then called Tommy to arrange a purchase. Agents were not able to locate Tommy. Nevertheless, they followed up on the information that Eberhardt had provided, and a consensual search of the stash house uncovered two high-speed money counters, a firearm, and a scale.

14) Petitioner is presently in the care, custody, and control of the United States Attorney General, incarcerated with the Bureau of Prisons under his sentence at the Federal Camp at Schuykill, Minersville, Pennsylvania.

15) The Petitioner submits this Motion pursuant to 28 U.S.C. § 2255 based upon the following violations of the Constitution of the United States, as more fully discussed in the Memorandum of Law filed contemporaneously herewith and incorporated herein by reference:

    (a) *Fifth Amendment Due Process Abridgment*: Petitioner's conviction was based upon (a) a defective indictment, (b) prosecutorial misconduct including

---

[2]As indicated in the Memorandum accompanying this Motion, this affidavit reflected "facts" that were based upon statements made by Bolden to the DEA, statements that he later changed as he consistently changed his proffer to the Government. Reflective of this creative prosecution, the Government never modified Petitioner's alleged confession to match up with the statements made by Bolden.

perjured testimony by a government informant, (c) and insufficient evidence. In addition, Petitioner's sentence was tainted in that its calculation and reliance on the unconstitutionally applied Sentencing Reform Act of 1984 violated Petitioner's Fifth Amendment rights.

(b)    *Sixth Amendment Right to Counsel Abridgment*:   Petitioner's conviction and sentence should be reversed as Petitioner did not receive effective assistance of counsel during the trial, sentencing, and appellate phases of the underlying criminal proceedings.

WHEREFORE, in consideration of the foregoing as well as arguments of law contained in the Memorandum of Law filed herewith, the Petitioner respectfully prays that this Court issue an Order vacating the sentence heretofore imposed in the instant case, based upon the violations of Petitioner's constitutional protections. Further, Petitioner requests, pursuant to 28 U.S.C. § 2255, that this Court cause notice of this Motion to be served upon Respondent and, to determine the issues herein, hold a prompt hearing hereon.

By:    /s/ Robert A. Ratliff
Robert A. Ratliff, Esq.
Attorney for Petitioner
713 Dauphin Street
Mobile AL 36602
Tel:  251-438-2250

June 12, 2008

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing Motion appended thereto has been sent this 12

day of June, 2008 by Electronic Delivery to:

**Amarjeet Singh Bhachu**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
(312) 353-5300
Email: amarjeet.bhachu@usdoj.gov

By:/s/ Robert A. Ratliff
Robert A. Ratliff, Esq.
Attorney for Petitioner
713 Dauphin
Mobile AL 36602
Tel:  251-438-2250

# CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**

Ivan Eberhardt

**DEFENDANTS**

USA

**(b)** County of Residence of First Listed Plaintiff    Incarcerated
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Robert A. Ratliff, PC
713 Dauphin Street
Mobile, AL  36602   251-438-2250

Attorneys (If Known)
AUSA Chicago, IL

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☑ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (excl. vet.)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Inj.

PERSONAL INJURY
- ☐ 362 Personal Injury— Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Security/Commodity/Exch.
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 ADA—Employment
- ☐ 446 ADA — Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☑ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☑ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

28 USC 2255 Motion to Vacate Sentence

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary)

**VIII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ ____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☑ No

**IX. This case**  ☑ is not a refiling of a previously dismissed action.

☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE  06/12/2008

SIGNATURE OF ATTORNEY OF RECORD

/s/ Robert A. Ratliff

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
## ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

In the Matter of                                             Case Number:

Ivan Eberhardt v USA

### AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

Ivan Eberhardt

| |
|---|
| NAME (Type or print)<br>Robert A. Ratliff |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)<br>s/ Robert A. Ratliff |
| FIRM<br>Robert A. Ratliff, PC |
| STREET ADDRESS<br>713 Dauphin Street |
| CITY/STATE/ZIP<br>Mobile, AL 36602 |

| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE NUMBER<br>251-438-2250 |
|---|---|

| | | |
|---|---|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES **X** | NO ☐ |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES **X** | NO ☐ |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES **X** | NO ☐ |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES **X** | NO ☐ |

IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.

RETAINED COUNSEL **X**          APPOINTED COUNSEL ☐

**VERIFICATION**

I, Ivan Eberhardt, hereby declares, verifies and affirms under penalty of perjury that the facts stated in the foregoing Motion and the accompanying Memorandum of Law are true and correct to the best of my knowledge and belief.

Executed on June  5 , 2008 pursuant to 28 U.S.C. §1746

IVAN EBERHARDT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

IVAN EBERHARDT,                          *

      Petitioner,                        *                    Civil No.

v.                                       *                    Orig. Crim. No. 98-CR-946

UNITED STATES OF AMERICA, *

      Respondent.                        *

* * * * * * * * * *

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO VACATE,**
**SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255**

    As a matter of introduction, Petitioner respectfully submits that the events which transpired

in the instant case constitute a denial of Petitioner's Due Process rights, as guaranteed by the Fifth

Amendment to the United States Constitution, and his right to effective assistance of counsel as

guaranteed by the Sixth Amendment. In short, the Petitioner submits that his sentence in the instant

case should be vacated in light of these constitutional violations. In the alternative, and at the very

least, the Petitioner deserves an evidentiary hearing to present these issues as well as supporting

evidence.

**STATEMENT OF ISSUES UNDER CONSIDERATION**

    Petitioner respectfully requests that this Court adjudicate the following issues of law as it

considers the Petitioner's Motion to Vacate, Set Aside or Correct Judgment pursuant to 28

U.S.C. §2255:

    ***(a) Fifth Amendment Due Process Abridgment***: Petitioner's conviction was based upon

(a) a defective indictment, (b) prosecutorial misconduct including perjured testimony by a

government informant, ( c) and insufficient evidence. In addition, Petitioner's sentence was

tainted in that its calculation and reliance on the unconstitutionally applied Sentencing Reform Act of 1984 violated Petitioner's Fifth Amendment rights.

**(b)  Sixth Amendment Right to Counsel Abridgment**: Petitioner's conviction and sentence should be reversed as Petitioner did not receive effective assistance of counsel during the trial, sentencing, and appellate phases of the underlying criminal proceedings.

**( c)  Actual Innocense:** Petitioner's conviction violates the provisions of the Constitution and the Laws of the United States as the Petitioner is actually innocent of the charged conduct.

**(d) Evidentiary Hearing**: Petitioner is entitled to an evidentiary hearing on these issues.

## JURISDICTION

The jurisdiction of this post-conviction remedy, as well as the scope of its application, is established within the statutory framework of 28 U.S.C. §2255. Specifically, a prisoner in custody may move the court that imposed the sentence to vacate, set aside, or correct a conviction or sentence imposed in violation of the United States Constitution or any of the laws of the United States. *See*, Davis v. United States, 417 U.S. 333, 41 L.Ed.2d 109, 94 S.Ct. 2298 (1974) A motion by a federal prisoner for postconviction relief under 28 U.S.C. §2255 is subject to a one-year time limitation that generally runs from "the date on which the judgment of conviction becomes final." Clay v. United States, 537 U.S. 522, 524, 123 S. Ct. 1072, 155 L. Ed. 2d 88 (2003) (quoting 28 U.S.C. §§ 2255(1)). Although the start of the limitations period can be delayed if the right asserted by the defendant is one that has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review, see 28 U.S.C. §§

2255(3), Petitioner does not assert such a right. The limitations period therefore runs from the date his conviction became final.

Petitioner's conviction was reviewed by the Seventh Circuit Court of Appeals and a writ of certiorari was requested to the United States Supreme Court. The writ of certiorari was denied on June 18, 2007. Eberhart v. United States, 127 S. Ct. 2987, 168 L. Ed. 2d 705, 2007 U.S. LEXIS 7754 (2007) He therefore has until June 18, 2008 to file his habeas petition. United States v. Marcello, 212 F.3d 1005 (7th Cir. 2000) (Defendant has until the close of business on the anniversary date of the certiorari denial to file a 2255 motion, even when the intervening period includes a leap year day.)

Petitioner is presently in the custody of the Attorney General of the United States, currently serving his 135 month term of incarceration at FCI-Schuylkill, Minersville, Pennsylvania.


**ARGUMENTS OF LAW**

**I. CAUSE AND PREJUDICE**

A motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255 must allege one of three bases as a threshold standard for sustaining such a motion. These bases are:

(1) An error of constitutional magnitude;

(2) A sentence imposed outside the statutory limits;

(3) An error of fact or law which was so fundamental as to render the entire proceedings invalid.

United States v. Addonizio, 442 U.S. 178 (1979)

In the instant matter, errors of both constitutional magnitude as well as fundamental errors of fact and law occurred of such a nature that the entire conviction and sentencing proceedings lacked the minimally requisite due process integrity established in the Federal Judiciary. As indicated below, sufficient facts are present and can be shown in an evidentiary hearing to reflect that this standard was not met.

Petitioner seeks to vacate and set aside his conviction and sentence due to errors implicating both the Fifth and Sixth Amendments to the U.S. Constitution. But for these abridgments, Petitioner would not have suffered the imposition of a criminal conviction unsupported by law and based on a flawed criminal justice process. In sum, the trial, sentencing, and appellate review phases of Petitioner's criminal proceedings present the "'exceptional circumstances" which underscore the need for collateral relief, as addressed by the Supreme Court in Bowen v. Johnston, 306 U.S. 19, 27, 83 L. Ed. 455, 59 S. Ct. 442 (1939).

In all cases, when such errors occur and actual prejudice results, 28 U.S.C. §2255 provides for collateral review. See United States v. Frady, 456 U.S. 152 (1982) To be successful in a collateral review under §2255, a party must show a threshold causal event and prejudice to the defendant. As indicated herein, both cause and prejudice are present in this case.


II      **PETITIONER'S CONVICTION WAS OBTAINED NOTWITHSTANDING A FLAWED INDICTMENT THAT FAILED TO PLACE THE PETITIONER ON NOTICE AS TO THE ALLEGED CRIMINAL CONDUCT, AND WHICH WAS OBTAINED THROUGH PROSECUTORIAL MISCONDUCT INCLUDING PERJURED TESTIMONY BEFORE THE GRAND JURY. ADDITIONALLY, THE CONVICTION WAS OBTAINED THROUGH A JURY VERDICT WHICH FAILED TO INCORPORATE AND DETERMINE, BEYOND A REASONABLE DOUBT, ALL ELEMENTS OF THE OFFENSE OF CONVICTION.**

Petitioner contends that the Indictment under which he was convicted was fatally flawed, because (a) it failed to put the Petitioner on notice as to the alleged criminal conduct; and (b) was obtained through prosecutorial misconduct and perjured testimony. In furtherance of these flaws, the jury verdict failed to incorporate and determine, beyond a reasonable doubt, all elements of the offense of conviction, thus invalidating the ultimate conviction .

***The Law***

The Sixth Amendment requires that a defendant be informed of the nature and cause of the accusation. The Supreme Court has stated that one of the protections which an indictment is intended to guarantee is measured by "whether the indictment contains the elements of the offense intended to be charged and sufficiently apprizes the defendant of what he must be prepared to meet." Russell v. United States, 369 U.S. 749, 763, 82 S.Ct. 1038, 1046 (1962). As such, the indictment must allege the elements of the offense charged and the facts which inform the defendant of the specific offense with which he is charged. Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000); Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827 (1999); United States v. Horton, 676 F.2d 1165 (7th Cir. 1982).

The failure to include each and every essential element of an offense renders an indictment constitutionally defective. *See*, Dunn v. United States, 442 U.S. 100, 99 S.Ct. 2190 (1979); United States v. Horton, *id.*

-5-

### *The Indictment*

The Petitioner was charged with two counts, the first count being a violation of 21 U.S.C. §846, conspiracy to possess with intent to distribute cocaine, and the second count (for which Petitioner was acquitted) being a substantive count of possession of approximately two kilograms of cocaine in violation of 21 U.S.C. 841(a)(1).®. 111, 137)

### *FIRST DEFECT: VAGUENESS AND LACK OF NOTICE*

The first defect in the indictment lies in its lack of clarity to place the Petitioner on notice as to the alleged criminal conduct. An indictment is only sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. United States v. Bailey, 444 U.S. 394, 414, 100 S. Ct. 624, 636, 62 L. Ed. 2d 575 (1980), quoting Hamling v. United States, 418 U.S. 87, 117, 94 S. Ct. 2887, 2907, 41 L. Ed. 2d 590 (1974); United States v. L'Hoste, 609 F.2d 796, 800 (5th Cir.), *cert. denied*, 449 U.S. 833, 101 S. Ct. 104, 66 L. Ed. 2d 39 (1980). The subject indictment does not.

It is well established in our national jurisprudence that in order for an indictment to notify adequately the defendant of the nature of the charges against him, "we require at a minimum that it provides some means of pinning down the specific conduct at issue." United States v. Smith, 230 F.3d 300, 306 (7th Cir. 2000) The indictment narrates that the Petitioner, together with individuals known and unknown to the grand jury, conspired to possess with the intent to distribute cocaine. Who are these individuals? That obvious first question is fundamental for the Petitioner to prepare and maintain a defense to this onerous charge. Were they informants? Purchasers? Sellers? Or were

those unknown individuals truly individuals who, as a matter of law, could be co-conspirators? Without this information, Petitioner was unable to be fully informed sufficiently to defend against the charged offense. And as a matter of law, an indictment is deficient if it does not provide enough factual details sufficiently to appraise the defendant of what he must be prepared to meet. United States v. Abu-Shawish, 507 F.3d 550 (7th Cir. 2007)

### SECOND DEFECT: LACK OF AGREEMENT

A legally sufficient agreement sits at the foundation of a charge of conspiracy. Petitioner's indictment fails to allege an agreement. Petitioner knew that his alleged co-conspirator could not have been Charles Bolden, the only other individual mentioned by name in the indictment, for he was, as alleged by the Government, at best a government informant/purchaser of cocaine from the Petitioner. Under the well-established rule of Sears v. United States, 343 F.2d 139 (5th Cir. 1965), an agreement with a government informant cannot constitute a criminal conspiracy. *See*, United States v. Spotts, 851 F.2d 890 (7th Cir. 1988) Yet it is Mr. Bolden who is the sole person mentioned in the indictment.[1] The indictment against the Petitioner is flawed in failing to provide either the names, or at least the circumstances creating the other co-conspirators supporting the allegations of an agreement between parties. As a charging instrument, except for facts associated with the Petitioner and the government informant, it improperly and unconstitutionally provides only conclusionary opinions with no specifics to place the Petitioner on notice of the charges against which he must defend. *See*, United States v. Outler, 659 F. 2d 1306 (5th Cir. 1981)(failure of an

---

[1]In order to understand fully Bolden's criminal involvement, attention is directed to the superseding indictment filed against Bolden in his case, United States v. Charles Bolden, Case No. 98 CR 936, USDC, ND Ill, which charging document was never disclosed to Judge Zagel.

indictment to set forth all elements of an offense violates the protections of the Fifth Amendment for grand jury determination of probable cause as to all elements and violates the Sixth Amendment protection requiring that every criminal defendant be informed of the full nature and cause of the accusation.)

The indictment failed to be clear and failed to specifically state the essential facts constituting the offense charged. It failed to allege properly and essentially the foundation of a conspiracy or agreement between proper parties available to form a conspiracy. Further, the indictment failed to allege that the Petitioner knew of the conspiracy, and of its illegal objective, and failed to allege that he agreed to participate in its achievement. United States v. Albarran, 233 F.3d 972 (7th Cir. 2000)

Without a clear understanding of the conspiracy charge against him, who he conspired with and for what, Petitioner could not be informed of the full nature of the cause against him. Such a violation of his Fifth Amendment right provides the cause "prong" required in a collateral proceeding. The second prong, that of prejudice, is reflective in the fact that no defense was, nor could have been, presented to address the conspiracy as the Petitioner had no idea who he had conspired with. See, United States v. Gallardo, 497 F.3d 727, 737 (7th Cir. 2007); United States v. Zarnes, 33 F.3d 1454 (7th Cir. 1994)

### THIRD DEFECT: OBTAINED THROUGH PERJURY

No collateral review of Petitioner's conviction can occur without an amazement at the extent of the perjured testimony presented to the grand jury. Predominately through the testimony of Charles Bolden, DEA Agent Dan Foley, and DEA Agent Robert Glynn, Federal prosecutors abused the grand jury process by allowing unchecked the testimony of these witnesses.

It is apparent from the record and continuing sworn statements that Charles Bolden is confused and challenged by the truth. After weaving a web of untrue statements in exchange for his overly lenient sentence, he has a multitude of experiences in presenting false testimony. His primary goal in everything he said was in minimizing the consequences of his criminal activity.

> . . . the Government conduct was of such a nature, that required Petitioner [Bolden] "to come up with somebody", or everything was on me, including facing the mandatory/minimum sentence. Petitioner was unaware that two kilos doesn't come under such a sentence. The government insisted that they knew that five or more kilos from a supplier would allow me to receive the Governments promise of two and one half years. Petitioner was reacting out of the fear of being imprisoned away from his young daughters for many years and therefore acted in the "heat of the moment" and provided the Government with what they wanted to hear, at that moment in time. I therefore named IVAN EBERHARDT because he was the first name that came to my mind. I can only state that if it was not for the Governments threatening me with the mandatory/minimum I would not have just given them a name. I'm very sorry for my actions, but I was very scared.

Bolden v. United States, Case # 1:03-cv-01070, USDC ND Ill, 2255 Motion, page 43

Because of Bolden's consistent with the truth and in light of the unreliability of his self-serving, conflicting statements, the Government decided not to use his testimony at trial.

The extent of the perjuries are pervasive and limitations to space herein burden Petitioner to outline all of the relevant and material falsehoods made by the Government witnesses in obtaining its indictment against the Petitioner. As indicated below, an evidentiary hearing is warranted to review these lies and perjured testimonies in light of the impact such statements had in the Government obtaining an indictment against the Petitioner. Some examples of untrue or conflicted testimony include:

- On December 22, 1998, Agent Foley issued an affidavit to support the issuance of a criminal complaint against Petitioner. This affidavit is at variance with what DEA Agent Glynn stated under oath at trial.

- In Paragraph 11 of the affidavit, Agent Foley testifies that Bolden asked the Petitioner if he could get two more kilos of cocaine. According to the affidavit, Petitioner's response was that he wanted a face to face meeting. First of all, the tape recordings reflect no such request. Secondly, the phrase "face to face" was not on the recording but was augmented by the DEA agents into the transcript. The agents augmented other matters into the transcripts of the taped meetings which were added into the record as well. These discrepancies and variances can easily be outlined in an evidentiary hearing as the entire conversations were taped.

- In Paragraph 12 of the affidavit, the agent stated that "they also specifically discussed the soap box used to deliver the cocaine. Bolden and Eberhardt then discussed the arrangements for another two kilo deal." A review of the actual tape recordings evidence no such discussion.

**FOURTH DEFECT: ADDITIONAL PROSECUTORIAL MISCONDUCT**

The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. Implicit in the concept of ordered liberty is the principle that the government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173 (1959) Further, the Government may not overcharge an individual, nor vindictively seek a conviction of an individual, when the evidence does not suggest such a charge. The underlying philosophy in this

regard is that "the United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. Stricker v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 1948 (1999), quoting Berger v. United States, 295 U.S. 78,88, 55 S.Ct. 629 (1935)

In light of *Napue* and its progeny, courts throughout the nation have held that a Fifth Amendment violation of general due process can be the basis to overturn a conviction, but it should be applied only in those instances where the conduct of the government reaches a demonstrable level of outrageousness. United States v. Kelly, 707 F.2d 1460 (C.A.D.C.1983); *also, see*, Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990). The test to determine if due process has been met is whether, under the circumstances, the accused received a fair trial. United States v. Baca, 687 F.2d 1356 (10th Cir.1982). Thus, when determining whether an error at the trial court violated due process, the Court must make a determination that evidence in the case was "so prejudicial in the context of the proceedings as a whole that [the defendant] was deprived of the fundamental fairness essential to the concept of due process." Scrivner v. Tansy, 68 F.3d 1234, 1239_40 (10th Cir.1995) (citations and internal quotation marks omitted), *cert. denied*, 516 U.S. 1178, 116 S.Ct. 1277, 134 L.Ed.2d 223 (1996). Such factors include knowingly using perjured testimony.

Once again, it cannot be understated that use of perjured testimony deprives both the accused and the proceedings themselves with the air of fundamental fairness requisite in all criminal proceedings. *See*, Blackmon v. Johnson, 145 F.3d 205 (5th Cir. 1998)(prosecution's knowing failure to correct false testimony violates due process if the false testimony reasonably could have affected

the judgment of the jury); <u>United States v. Haese</u>, 162 F.3d 359 (5th Cir. 1998)(A defendant's conviction must be reversed on due process grounds where the Government knowingly elicits, or fails to correct, materially false statements from its witnesses.)

The standard for addressing perjured testimony which leads to a conviction is clear and quite representative of the goals of the Fifth Amendment to the U.S. Constitution. "The dignity of the United States Government will not permit the conviction of any person on tainted testimony." <u>Mesareosh v. United States</u>, 352 U.S. 1 (1956) In no clearer terms, a criminal defendant is denied due process when perjured testimony is knowingly used or if known untrue testimony goes uncorrected. *See* <u>Napue v. Illinois</u>, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). This is true regardless of whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected. *See* <u>Giglio v. United States</u>, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); <u>Napue</u>, 360 U.S. at 269, 79 S.Ct. 1173.

The existence of false testimony violates the Fifth Amendment. The prejudice to the Petitioner where such testimony materially impacted the grand jury's deliberations is quite obvious. And, the knowing use of such false testimony by the Government substantially affected due process rights.

In addition to the false and conflicting affidavits, reports, and testimony of the DEA agents, the Government engaged in improper conduct throughout the course of the grand jury proceedings and the trial. First, the prosecutors sought to gain benefit from the perjury during the trial. And, the Government also sought improperly to bolster the credibility of Bolden by not calling him as a witness yet bringing in his actions and testimony through the DEA agents. Further, the government, in closing, asked the jury to consider drug amounts not charged in the indictment nor proven at trial.

-12-

The Government did not present the full tape recording and its proper transcript to the grand jury or at trial. And, as an evidentiary hearing would show, the government used closing arguments to mislead the jury in believing that the uncorroborated post arrest statements of the Petitioner provided sufficient evidence, beyond a reasonable doubt, of the level of drugs involved in this alleged conspiracy. United States v. Taylor, 471 F.3d 821 (7th Cir. 2006)(inadmissable hearsay cannot support the findings of drug quantity)

To establish prosecutorial misconduct, a movant "must show that the remarks were improper and that they prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." United States v. Adam, 70 F.3d 776, 780 (4th Cir.1995) (internal quotation marks omitted). "Improper remarks during closing argument do not always mandate retrial. 'The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)), cert. denied 113 S.Ct. 2966, 125 L.Ed.2d 666 (1992). The test for reversible prosecutorial misconduct generally has two components: that (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. United States v. Brockingham, 849 F.2d 872, 875 (4th Cir.1988)   In addition to undermining the propriety of the prosecution's conduct in this case, under Brockingham, the court must consider whether the conduct in this case "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a trial." Brockingham, 849 F.2d at 875. A number of factors should be considered when evaluating the issue of prejudice to the defendant:(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were

isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984) The issue of "[w]hether improper argument by government counsel has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *Id*. at 1051.

This court has already held that the Petitioner did not get a fair trial and this repeated conclusion lies with the prosecution and its improper conduct. See Judge Zagel's March 21, 2003 memorandum opinion and order granting a new trial. It is the Petitioner's argument that all of this conduct by the government prejudiced the fairness, the propriety, and the fundamental rights of the Petitioner during the grand jury proceedings and the trial, thus requiring a reversal of his conviction.

**III.    THE PETITIONER'S RIGHTS TO A JURY TRIAL AND DUE PROCESS OF LAW WERE VIOLATED WHEN HE WAS PUNISHED UPON FACTS THAT WERE NOT PROVED BEYOND A REASONABLE DOUBT; IF THE SENTENCING GUIDELINES ALLOW THE DISTRICT COURT TO PUNISH THE PETITIONER UPON SUCH FACTS, THE GUIDELINES ARE UNCONSTITUTIONAL AS APPLIED.**

The United States Constitution guarantees each defendant a trial by jury wherein no punishment is imposed until a jury determines the defendant guilty of particular conduct beyond a reasonable doubt. See U.S. Const. Amends. V, VI. At odds with that system is the Sentencing Reform Act of 1984, which sets up a system that appears to allow a district court to sentence or punish a defendant based upon conduct that is not admitted or proved beyond a reasonable doubt.

(Title II of The Comprehensive Crime Control Act of 1984); U.S.S.G. Chapter 1, Part A, intro.,

comment (3).

In addition to a base sentencing range established by reference to the jury verdict alone, the

guidelines prescribe enhanced sentencing ranges based on sentencing factors that are determined by

a judge after trial, by a preponderance of the evidence. U.S.S.G. Chapter 1, Part A, introduction,

comment (2) and (4)(a). In his dissent in Harris v. United States, 122 S.Ct. 2406, 153 L.Ed.2d 524

(2002), Justice Thomas reminded us that due process requires that every fact necessary to constitute

a crime must be found beyond a reasonable doubt by a jury if that right is not waived. Id. at 2424

(Thomas, J., dissenting), citing In re Winship, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068

(1970). Society has long recognized a necessary link between punishment and crime. Harris, 122

S.Ct. at 2424 (Thomas, J., dissenting), citing Apprendi v. New Jersey, 530 U.S. 466, 478, 120 S.Ct.

2348 (2000) ("The defendant's ability to predict with certainty the judgment from the face of the

felony indictment flowed from the invariable linkage of punishment with crime"). "Why, after all,

would anyone care if they were convicted of murder, as opposed to manslaughter, but for the

increased penalties for the former offense, which in turn reflect the greater moral opprobrium society

attaches to the act?" Harris, 122 S.Ct. at 2424 (Thomas, J., dissenting).

If a statute annexes a higher degree of punishment based on certain circumstances, exposing

a defendant to that higher degree of punishment requires that those circumstances be charged in the

indictment and proved beyond a reasonable doubt. Apprendi, 530 U.S. at 480, quoting J. Archbold,

Pleading and Evidence in Criminal Cases 51 (15th ed. 1862). For example, § 1B1.3, gives an

expansive interpretation of "Relevant Conduct." Under it, ordinary crimes such as perjury,

subornation of perjury, escape, and obstruction of justice arguably become "relevant conduct" or

"sentencing factors." According to Guidelines theorists, these semantics are enough to exempt such criminal conduct from the provisions of the 5th and 6th Amendments to the U.S. Constitution even though persons can be sent to prison for months and even years by proving with "reliable information" (not trial quality evidence) to a judge (not a jury) that it is more probably true than not true (not "beyond a reasonable doubt") that the defendant committed such "relevant conduct" (not crime).

But the sentencing guidelines cannot supersede the United States Constitution. The guidelines should not be used to accomplish an "end-run" around the fundamental right to trial by a jury and to usurp the role of the jury. If the jury finds a defendant guilty of a range of drug amount that could be as low as five kilograms, the district court should not be permitted to use the sentencing guidelines to ignore that verdict, take the jury's role, find responsibility for a higher drug amount, and punish based upon that extra-jury determination at a standard lower than proof beyond a reasonable doubt. See Anderson v. Fuller, 455 U.S. 1028, 1032, 102 S.Ct. 1734 (1982) (Burger, C. J., dissenting) (nothing that federal courts should not usurp the function of a jury in finding facts). Recently, the Supreme Court has begun to realize the fundamental defects in way our justice system determines sentences for criminal defendants in a series of decisions. In Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court clarified and reaffirmed this rule. The *Ring* holding is straightforward and clear-cut: The *Apprendi* rule applies to any aggravating fact necessary to expose a defendant to punishment beyond an otherwise mandatory statutory limit. *Id.* As recently observed by the United States District

Court for the district of Massachusetts regarding the Sentencing Guidelines, "the Sixth Amendment guarantee of trial by jury has been eroded as never before in the history of our nation, while the institutional judiciary complacently slips into forms of expression and modes of thought that unconsciously reinforce the Department agenda in a powerfully Orwellian way. United States v. Green, 2004 U.S.Dist. LEXIS 11292, *13 (D.Mass June 18, 2004).

After Apprendi, the various courts throughout the country assumed the term "statutory maximum" referred to in Apprendi and Ring, was the maximum sentence set forth under the statute listed in the indictment. The courts have assumed that the term "statutory maximum" does not apply to the various sentencing thresholds established under the federal sentencing guidelines. The Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) changes that and indicates that the courts have been wrong, holding that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. * * * When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment." Blakely v. Washington, 124 S.Ct. at 2537(emphasis in original) The Blakely decision not only clarifies what was meant by the term "statutory maximum," but also calls into question the constitutionality of current sentencing practices in federal court. The Court noted that the rule announced in Apprendi reflected two longstanding tenets of common-law criminal jurisprudence: "that the truth of every accusation against the defendant should afterwards be confirmed by a unanimous [jury verdict], and that an accusation which lacks any particular fact which the law makes essential to the punishment is ... no accusation within the requirements of the common law and it is no accusation in reason." (cites omit) Id. at *10. The Court then noted the

principle in American jurisprudence that "'every fact which is legally essential to the punishment' must be charged in the indictment and proved to a jury." *Id.*

The decision in <u>Blakely</u> was further bolstered by the recent decision issued in <u>United States v. Booker</u>, 2005 U.S. LEXIS 628 (2005). In <u>Booker</u>, the Court ruled that the federal Sentencing Guidelines were not mandatory in issuing federal sentences, but are to be used merely as an advisory tool. *Id.* at *7. The decision flowed from Justice Stevens' worry that as sentencing enhancements became greater, "the jury's finding of the underlying crime became less significant." *Id.* at *33. As such, the Sixth Amendment right to a jury trial was being usurped, requiring change in order to preserve "Sixth Amendment substance." *Id.* at *34. Furthermore, the court again reiterated its commitment to the ideal that any fact other than a prior conviction which is necessary to support a sentence exceeding the statutory maximum authorized by the jury's finding must be proved to a jury beyond a reasonable doubt. *Id.* at *45-6. In addition to the application of these cases to statutory maximum circumstances, the statutory mandatory minimum sentence required to be imposed must be established beyond a reasonable doubt. *See,* <u>United States v. Darmand</u>, 3 F.3d 1578 (2nd Cir. 1993)(the statutory mandatory minimum sentence established under 21 U.S.C. 841(b)(1) applies only to conduct which actually results in a conviction and not to Guideline defined "relevant conduct")

At Petitioner's sentencing, Judge Zagel, who would later express concerns over the fairness of the trial itself and would grant a new trial, likewise expressed his concern over the determination of drug quantity.

> The only part that I am willing to credit is that he did deal in the drugs and dealt with them over a period of time. But from the words alone, ***I am reluctant to conclude there is a particular quantity involved***, because I have to look elsewhere to find the quantity. The place I look to is the two actual kilos. . .(emphasis added)

Sentencing Transcript, April 22, 2005, page 37

Nevertheless, based upon the jury's determination of five kilograms of drugs, based on facts undisclosed and undetermined, the judge imposed a sentence based on a level thirty-two and a criminal history category two. Imposing a sentence of 135 months, Judge Zagel refused to depart down, even to the statutory minimum, because "Congress has quite clearly dictated" that a downward departure is not authorized. *Supra,* page 40 In fact, and in law, this sentence is incorrect.

The only evidence as to drug quantity is the two kilogram transaction for which the jury found the that Petitioner had no criminal liability. Anything more can only be deduced, implied, or guessed upon both for the jury's special verdict or for the judge's determination. Based on Judge Zagel's expressed doubt as to drug quantity and his (incorrect) belief that he had no choice but to follow Congress' dictates, Petitioner's sentence was imposed improperly and contrary to the Constitution.


### IV. PETITIONER'S CONVICTION AND SENTENCE WERE TAINTED AS PETITIONER DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE UNDERLYING CRIMINAL PROCEEDINGS.

The Sixth Amendment to the United States Constitution insures effective assistance of legal representation to all criminal defendants. "The right to competent counsel must be assured every man accused of crime in Federal court." State of Union Address, John F. Kennedy, January 14, 1963, U.S. Code Cong. and Admin. News, 2990. An abridgment of this core, constitutional right meets the "error of constitutional magnitude" outlined in <u>Addonizio</u>.

To see whether counsel has fallen below the minimum standard needed for effective assistance of counsel under the Sixth Amendment to the Constitution, a two-prong test must be met.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court outlined this two-prong test for ineffective assistance of counsel. A petitioner must demonstrate that counsel's performance at sentencing fell below an objective standard of reasonableness, and must show a "reasonable probability" that, but for counsel's errors, the results of the proceedings would have been different. Id. at 688, 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome," and it is a standard less than proof by a preponderance of the evidence. Strickland, 466 U.S. at 694.; Loyd v. Whitley, 977 F.2d 149 (5th Cir. 1992)(The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.)

For all of the failures of Petitioner's counsel, this Court must decide in light of all the circumstances facing counsel, whether his conduct fell within the wide range of professionally competent assistance expected of an attorney. Huynh v King, 95 F.3d 1052,1056 (11th Cir. 1996); Strickland, supra, 466 U.S. at 690. The Petitioner must prove that counsel's performance was unreasonable under prevailing professional norms, and that the challenged actions or omissions were not sound strategy. Strickland, 466 U.S. at 688-89

## FAILURE TO OBJECT TO ORIGINAL DETENTION

One of the key actions in any criminal arrest is fidelity to the parameters of the Fourth Amendment to the federal Constitution. Justice Frankfurter once noted that "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people," United States v. Rabinowitz, 339 U.S. 56, 69 (1950) (dissenting opinion), and nowhere is this observation more apt than in the area of the Fourth Amendment, whose words have necessarily been given meaning largely through decisions suppressing evidence of criminal activity.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . .", begins the Fourth Amendment. However, when the Government utilizes an informant, this right appears to become expendable.

In the case at bar, DEA Agents Glynn and Foley wired a transmitter microcassette to Charles Bolden and had him arrange for a meeting with the Petitioner. The meeting occurred in the Petitioner's car. Upon a pre-arranged signal, the meeting would end and the agents were to arrest the Petitioner for possession of cocaine. Everything was worked out with the informant as it had been in countless other operations, save for one detail. Typically, the prearranged signal is a clear matter that informs law enforcement of the presence of contraband or criminal activity. And while courts have consistently held that the warrantless entry into a house is presumptively unreasonable, Brigham City v. Stuart, 547 U.S. 398, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006), it has also been consistently held as is axiomatic that "[a] warrantless arrest . . . must be supported by probable cause." United States v. Navarro, 90 F.3d 1245, 1254 (7th Cir. 1996)

Probable cause can be justified by the information passed on to police by confidential informants. See, United States v. Medina, 944 F. 2d 60 (2nd Cir. 1991) However, when it is, such as in this case, the signal from the informant to the police must be clear, unique, and directly related to what the informant sees. In this case, ths signal was pedestrian and an act that would have occurred regardless of the existence or non-existence of criminal activity to support probable cause. The signal was when they physically exited the automobile and went to the back door of the car.

No probable cause nor exigent circumstances existed to seize the Petitioner, yet the DEA agents held him, arrested him, and interrogated him, all without a warrant. Unfortunately, counsel failed to make this argument properly and cogently to the trial court. Counsel failed to seek an

-21-

evidentiary hearing to explore the circumstances of the warrantless arrest. In this regard, counsel fell below the standard to which <u>Strickland</u> addresses.

**FAILURE TO DEFEND CONSPIRACY CHARGE**

In serving the needs of Petitioner, counsel was ineffective in not moving the court for specific defensive demands associated with the conspiracy charge. First of all, as indicated above, the indictment was vague regarding the conspiracy, so vague that no objective defendant could have defended the allegation. *See*, <u>United States v. Cecil</u>, 608 F.2d 1294, 1296 (9th Cir. 1979)(The purpose of an indictment is to provide the accused with a sufficient description of the offenses charged so that the accused will be able to prepare a defense.) Second, trial counsel failed, in its focused defense to address the substantive drug possession charge, to defend the conspiracy charge. Counsel failed to place the conspiracy in context, failed to obtain limiting jury instructions, and failed to address the allegations in opening and closing arguments.

In the context of failing to adequately put on a defense, whether counsel's omission served a strategic purpose is a pivotal point in <u>Strickland</u> and its progeny. *See*, <u>Strickland</u>, 466 U.S. at 691; and <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (emphasis on fact that counsel's failure "was not based on 'strategy,' but on counsel's mistaken beliefs..."). "The crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court." <u>Loyd,</u> *supra*. *See*, <u>Profitt v. Waidron</u>, 831 F.2d 1245, 1249, (5th Circ. 1987) (where counsel's omission presented "no advantage" to the defense, the court refused to accord "our usual deference to tactical decisions")

It is clearly unreasonable and below the standard of the profession for a defense attorney not to put on a defense when required to do so by an indictment allegation and when asked to do so by his client.

## FAILURE TO INVESTIGATE

As part of counsel's duty to defend, he maintains a duty to fully investigate the case so he can examine and cross-examine witnesses, investigate and raise valid defenses, and investigate the true nature of the alleged conduct and present expert testimony on the issue. Failure to do so constitutes ineffective assistance of counsel. See, Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)

As the Supreme Court recognized in Strickland, "counsel bears a duty to make a 'reasonable' investigation of the law and facts in his client's case." Strickland, 466 U.S. at 691. Additionally, the ABA Standards Relating to the Administration of Criminal Justice provide:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.
> Standard 4-4.1.

It is well established that a defendant's right to effective assistance of counsel confers a duty on counsel to conduct an adequate pre-trial investigation. Our sister circuit has addressed the matter more than most. McCoy v. Newsome, 953 F.2d 1252, 1262 (11th Cir. 1992). "[W]hen a lawyer fails to conduct a substantial investigation into any of his client's plausible lines of defense, the lawyer

has failed to render effective assistance of counsel." *Id.* at 1262-63. "Pre-trial preparation, principally because it provides a basis upon which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation." House v. Balkcom, 725 F.2d 608, 618 (11th Cir. 1984). "Failure to investigate evidence that would be helpful to the defense is also an indication of ineffective assistance of counsel." *Id.* A lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course. Rogers v. Zant, 13 F.3d 384, 387 (11th Cir. 1994). Such determinations are allowable because "good advocacy requires the winnowing of some arguments in favor of stressing others. . ." *Id.* at 388.

It is a defense attorney's responsibility to prepare for any key witnesses to be examined at trial. See, Aldrich v. Wainwright, 777 F.2d 630 (11th Cir. 1985)(counsel was ineffective in failing to take the deposition of the State's key witness) Such a preparation, especially in light of the nature of this case, was non-existent. One of the prime examples of this deficiency was counsel's preparation for and taking the testimony of Charles Bolden. While the Government had physical control over this witness, counsel could have demanded his presence, his deposition, or, then, after attempting to first obtain direct testimony from Bolder, a missing witness jury instruction.

In the instant case, counsel rendered ineffective assistance when he (1) failed to present before the jury readily available testimony crucial to undermining the Government's case, (2) failed to allow the Petitioner to testify on his own behalf, (3) failed to prepare to cross-examine the Government's key witnesses, and (4) failed to interview and call other crucial defense witnesses (such as Eric Burgess). The Government's strategy was to gain a conviction at all costs even to the point of knowingly misrepresenting the facts. Such distortion by the Government taken together with an already challenging case created a special need to provide the jury with a defense-oriented

-24-

explanation of the government informant, the need to cooperate at all costs, and the true understanding of the relationship between Bolden and the Petitioner.

### FAILURE TO OBJECT TO TAPED CONVERSATIONS

The case against the Petitioner was based entirely on ambiguous tape recordings (and a disputed confession.) The tapes only established the petitioner knew that Bolden was a drug dealer and that Bolden had told the Petitioner about his delivery of a soap powder box, as well as his encounter with the DEA. These taped conversations did not address anything else.

It is undisputed that the transcripts introduced at trial contained material inaccuracies. Rather than object to the introduction of the tapes or their transcripts, counsel used the tapes as a basis for his motion for a new trial. Nevertheless, this failure to object, in addition, was an unreasonable act even noted by the appellate court when the case was under judicial review. The jury was given both the tapes and the inaccurate transcripts, conflicting matters of evidence that confused them and led to an inconsistent verdict. The jury, without any objection from counsel, did not even have the opportunity to listen to all of the recordings.

The tapes were very difficult to hear, as this Court will remember. In sum, the tapes presented no incriminating conversations but should have been limited in its use by the jury. At sidebar, counsel for the Petitioner objected to the tapes on grounds of inadequate foundation. This poor use of the rules of evidence was clearly addressed when the trial judge ruled that the tapes would be admitted under the theory of "direct identification." See Trial Transcript, Tr. 63 Nevertheless, the Circuit Court of Appeals found that no proper objection by the Petitioner was made and preserved for appellate review. Such a failure materially prejudiced the Petitioner.

-25-

**FAILURE TO OBJECT TO HEARSAY TESTIMONY**

The DEA agents consistently introduced hearsay testimony (important for the Government as it was too precarious to put Bolden on the stand), testimony that was incorrect, tainted the proceedings, and forestalled the Petitioner from directly confronting his accuser. Whether it be hearsay testimony about alleged prior debts or hearsay testimony about a prior drug transaction, these alleged facts were not direct, were presented for the truth of their matter, and materially prejudiced the Petitioner. Counsel fell below the standard established in <u>Strickland</u> when he failed to object to the introduction of these statements.

**FAILURE TO OBJECT TO PROSECUTORIAL ACTS OF MISCONDUCT**

While a collection of prosecutorial acts of misconduct are presented elsewhere in this pleading, additional acts include:

Improper vouching for Government witness.[2]

Improper expert witness testimony as to drug dealings.

Improper expert witness testimony as to code language between drug dealers[3]

Government's refusal to make Charles Bolden available for interview or deposition

---

[2]The prosecution repeatedly, and improperly vouched for Bolden in its closing arguments. Defense counsel failed to object appropriately.

[3]Expert witness testimony regarding code language that was actually predicated on plain language was false and yet repeated by prosecution as fact. When testimony that "battery was low" was presented, in was given as fact: the cell phone battery was low. Conjuring up fictional codes about drugs and drug supplies lacked foundation, was misconduct, and counsel failed to object appropriately.

Untruthful statements to the court as to Bolden's status as a cooperating witness

Improper jury instructions or omissions from instructions

Failure to explain to the jury the fact that Bolden was not a conspirator.

Failure to provide complete tape recordings in their original form to the jury.

None of these acts of misconduct elicited objections from counsel and all tainted the fairness of the trial court proceedings. An evidentiary hearing would provide a proper forum for outlining the full extent of misconduct and counsel's failure to object.

### FAILURE TO APPEAL FOURTH AND FIFTH AMENDMENT VIOLATIONS

Under the Sixth Amendment, a criminal defendant has the right to effective assistance of counsel on appeal. It is appellate counsel's constitutional duty to seek judicial review of errors or decisions of the trial court that should be challenged.. And while possible errors by counsel at the appellate level are generally presumed to be tactical in nature, United States v. Ashimi, 932 F. 2d 643 (7th Cir. 1991), this presumption is due to the necessity of finding evidence outside of the record to support a claim of deficiency in counsel's representation. When that evidence is clear from the record, this presumption is easily rebuttable. Underlying the entire evolution of Bolden's arrest, his cooperation, and his affirmative decision to suggest (unsubstantiated ) that Petitioner was involved

in criminal activity is the fundamental premise of our constitutional restrictions on warrantless seizures.

As indicated above, Petitioner was arrested and held without liberty without a warrant and without probable cause. This Fourth Amendment violation was not raised on appeal by counsel. Further, the sufficiency of the indictment, as indicated above, the sufficiency of the evidence to support a conspiracy claim, and other constitutional errors were absent from appellate counsel's brief seeking judicial review. *Cf.,* Shell v. United States, 448 F.3d 951 (7th Cir. 2006)

## CUMULATIVE ACTS OF OMISSION AND COMMISSION

Courts throughout the nation have confirmed that a failure to meet the minimum standard of Strickland can be met through the aggregate of cumulative acts of omission and commission by counsel. *See,* Lawhorn v. Allen, 519 F.3d 1272 (11th Cir. 2008)(determination is based on a review of the entire postconviction record as a whole and with consideration of all cumulative evidence) When all of the foregoing are added to counsel's refusal to defend the conspiracy charge, refusal to allow Petitioner to testify, refusal to prepare and investigate the case, failure to make any objections during the Government's closing arguments, and failure to preserve objections at the trial level for appellate review, it is clear and clearly prejudicial that Petitioner was burdened with ineffective assistance of counsel.

-28-

V.    **PETITIONER IS ENTITLED TO A VACATION OF HIS SENTENCE AS HE IS ACTUALLY INNOCENT**.

The Petitioner is actually innocent. To be sure, far too many defendants make such claims, both prior to adjudication and while incarcerated. However, the present case is one of those rare examples of an innocent individual being found guilty by association and without any independent evidence elicited at trial.

There was no physical evidence in this case. The only drugs seized were those of Mr. Bolden and were shown at trial to have nothing to do with the Petitioner. The jury acquitted the Petitioner of any substantive possession charge. The Petitioner has not drugs. He was never found to have possessed any tools of the drug trade: no cash, no guns, no scales, no baggies, no cutting agents, no unexplained wealth. Finally there has been not one single witness who testified that he bought or sold drugs . Not one single witness came into open court to testify that they saw the Petitioner with drugs. No one single witness observed illegal activity; The only evidence against the Petitioner was an ambiguous tape recorded statement and an alleged and unsubstantiated statement wrangled out of him, which statement reinforces the position of lack of knowledge and lack of any conspiracy or agreement between parties.  The record directly reflects this as well as the totality of the case.

Notwithstanding the global accusations made by the Government in its indictment, no proof was presented to reflect that Petitioner conspired with anyone for the distribution of

-29-

cocaine. The ultimate safety net in our judicial system is for the trial judge to dismiss such a case when the evidence, or lack thereof, indicates no violation of our criminal laws. Judge Zagel attempted this when he granted a new trial as he saw that the proceedings were not fair. His intercession for want of due process was unfortunately short-lived.

There is an objective absence of any testimony or evidence associating the Petitioner with any illegal activity. There is no evidence that the Petitioner conspired with anyone, except for an alleged confession that was coerced and contrary to other facts that government proffered to the court. There is no evidence that the Petitioner was engaged in a conspiracy to further some illegal conduct. In order to prove a criminal conspiracy, evidence must be presented of an agreement between two or more persons formed for the purpose of committing a crime. P. Marcus, The Prosecution and Defense of Criminal Conspiracy Cases § 1.03 (1985). See, e.g., United States v. Saenz, 747 F.2d 930, 937 (5th Cir.1984), reh'g denied, 752 F.2d 646, (en banc ) (1985). No such evidence was presented because no such evidence exists.

Petitioner was not convicted because he lied, cheated, or stole. He was not convicted because he possessed drugs or tried to possess drugs. He had no indicia of drug activity. Petitioner was indicted and then convicted because the Government needed a conviction, regardless of the facts, or the law.  The Petitioner is not guilty because he did not commit any crime and no evidence that he did was ever presented to the jury.

VI. **PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING ON THESE ISSUES.**

The Petitioner contends that, at minimum, he is entitled to an evidentiary hearing on the matters raised in the instant motion. The Petitioner submits that resolution of the issues raised will require an examination of evidence beyond the scope of the record.

In the case of United States v. Smith, 915 F2d 959 (5th Cir. 1990), the Fifth Circuit stated the national consensus, holding that "If the district court cannot resolve the allegations without examining evidence beyond the record, it must hold a hearing." *Id*. at 964 Further, where a due process claim is alleged, a hearing should be held where the record is unclear on the facts underlying the claim. Blackmon v. Scott 22 F.3d 560,567 (5th Cir. 1994); *also see*, United States v. Myers, 892 F.2d 642 (7th Cir. 1990) and Kafo v. United States, 467 F.3d 1063 (7th Cir. 2006) In the present case, the Petitioner has raised several claims, including ineffective assistance of counsel, which rely on facts occurring outside of the record. Further, if the Court takes the Petitioner's allegations as true, the Petitioner is entitled to relief. Therefore, at a minimum, a hearing should be held on these claims.

The Petitioner submits that the verified claims he has raised in the present petition are not frivolous. Also, the scope of the review necessary to resolve these issues of ineffective assistance of counsel necessarily go beyond the record. Therefore, the Petitioner suggests that a studied

examination by this Court could best occur in an evidentiary hearing. The Petitioner requests that

this Court, therefore, order an evidentiary hearing to consider the petitioner's claims for relief.

## CONCLUSION

WHEREFORE, in consideration of the foregoing, the Petitioner prays this Court to issue

an order vacating the conviction and sentence previously imposed due to the errors of

constitutional magnitude outlined herein. In the alternative, Petitioner requests an evidentiary

hearing at which time evidence further supporting the abridgment of his constitutional

protections may be submitted to this Court. The Supreme Court stated in <u>Kyles v. Whitley</u>, *Id*.

that the type of issues, such as those raised herein, go to the very core of due process, the very

essence of Constitutional fairness. Is there a reasonable probability that but for these errors there

would have been a different result, asked Justice Souter in the Kyles case? In the present case,

the answer is clearly yes. The Government's actions, coupled with the Petitioner's counsel,

served to insure that Petitioner did not receive a fair trial, a trial resulting in a verdict worthy of confidence.

Respectfully submitted,

By: ___ /s/ Robert A. Ratliff
       Robert A. Ratliff, Esq.
       Attorney for Petitioner
       713 Dauphin Street
       Mobile AL 36602
       Tel:  251-438-2250

June 12, 2008

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing Motion appended thereto has been sent this 12

day of June, 2008 by Electronic Delivery to:

**Amarjeet Singh Bhachu**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
(312) 353-5300
Email: amarjeet.bhachu@usdoj.gov

By:     <u>/s/ Robert A. Ratliff</u>
        Robert A. Ratliff, Esq.
        Attorney for Petitioner
        713 Dauphin
        Mobile AL 36602
        Tel:  251-438-2250

EXHIBIT A
INDICTMENT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE LINDBERG

UNITED STATES OF AMERICA )
                               )
              v.               )   No. 98 CR 936
                               )   Violations: Title 21,
                               )   United States Code,
CHARLES BOLDEN and             )   Sections 841(a)(1) and 846
MARCUS E. DAVIS                )   Superseding Indictment

## COUNT ONE

The SPECIAL JANUARY 1999-2 GRAND JURY charges:

1.    From in or about December 1997 and continuing until in or about December 1998, in the Northern District of Illinois, Eastern Division,

CHARLES BOLDEN and
MARCUS E. DAVIS,

defendants herein, conspired with each other, and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute over five kilograms of mixtures containing cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.    It was part of the conspiracy that defendant CHARLES BOLDEN obtained cocaine from his supplier, Ivan Eberhardt, for purposes of resale, delivery, and distribution to others.

3.    It was further part of the conspiracy that, in or about November 1998, defendant MARCUS E. DAVIS arranged for the sale of more than 500 grams of cocaine from BOLDEN to an individual (referred to herein as "Individual A") whom DAVIS had introduced to BOLDEN.

4.    It was further part of the conspiracy that, in or about November 1998, BOLDEN obtained over 500 grams of cocaine from Eberhardt.    BOLDEN subsequently distributed the cocaine to Individual A at DAVIS's residence in Blue Island, Illinois.

5.    It was further part of the conspiracy that, in or about December 1998, DAVIS arranged for the sale of approximately two kilograms of cocaine from BOLDEN to Individual A.

6.    It was further part of the conspiracy that, in or about December 1998, BOLDEN obtained approximately two kilograms of cocaine from Eberhardt on consignment.    BOLDEN agreed to pay Eberhardt $40,000 from the proceeds of the sale of the cocaine.

7.    It was further part of the conspiracy that, on or about December 16, 1998, BOLDEN distributed the two kilograms of cocaine to Individual A at DAVIS's residence.

8.    It was further part of the conspiracy that defendants BOLDEN and DAVIS would and did misrepresent, conceal, and hide, and cause to be misrepresented, concealed, and hidden, the purposes and acts done in furtherance of the conspiracy, and used means to avoid detection and apprehension by law enforcement authorities;

All in violation of Title 21, United States Code, Section 846.

2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE ZAGEL

MAGISTRATE JUDGE LEVIN

UNITED STATES OF AMERICA )
)
v. )
)
IVAN EBERHARDT )
)
)
)

No. 98 CR 946
Violations: Title 21,
United States Code,
Sections 841(a)(1) & 846

MAR 17 1999

### COUNT ONE

The SPECIAL JANUARY 1999-2 GRAND JURY charges:

Beginning in or about December 1997 and continuing until in or about December 1998, in the Northern District of Illinois, Eastern Division, and elsewhere,

IVAN EBERHARDT,

defendant herein, conspired with Charles Bolden and others known and unknown to the Grand Jury to knowingly and intentionally possess with intent to distribute and distribute kilogram quantities of mixtures containing cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

2. It was part of the conspiracy that defendant EBERHARDT sold kilogram quantities of cocaine to Charles Bolden so Bolden could resell the cocaine to others.

3. It was further part of the conspiracy that on or about December 16, 1998, defendant EBERHARDT distributed at least two kilograms of cocaine to Charles Bolden for resale.

4. It was further a part of the conspiracy that on or about December 16, 1998, Charles Bolden sold the cocaine received from



defendant EBERHARDT to an individual who was cooperating with the Drug Enforcement Administration.

5.   It was further part of the conspiracy   that defendant EBERHARDT would and did hide, misrepresent, conceal, and cause to be misrepresented, concealed, and hidden, the purposes of acts done in furtherance of the conspiracy, and would and did use means to avoid detection and apprehension by law enforcement authorities;

In violation of Title 21, United States Code, Section 846.

## COUNT TWO

On or about December 16, 1998, in the Northern District of Illinois, Eastern Division,

IVAN EBERHARDT,

defendant herein, distributed approximately two kilograms of mixtures containing cocaine, a Schedule II Controlled Substance;

In violation of Title 21, United States Code, 841(a)(1).

A TRUE BILL:

_William G. Peterson_
FOREPERSON

ACTING _Sheila Finnegan_
UNITED STATES ATTORNEY

3

EXHIBIT B
JUDGMENT AND COMMITMENT

(Rev. 03/05)

# United States District Court
## Northern District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| IVAN EBERHARDT | ) |

Case Number:  98-CR-946-1
Judge:  James B. Zagel

Leonard Goodman, Defendant's Attorney
Amarjeet Bhachu, AUSA

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

**THERE WAS A:**

jury verdict of guilty as to count(s) 1 of the indictment.

**THERE WAS A:**

judgment of acquittal as to count(s) 2 of the indictment.  The defendant is acquitted and discharged as to this/these counts.

## THE DEFENDANT IS CONVICTED OF THE OFFENSES(S) OF:

| Title & Section | Description of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21:841(a)(1) and 846 | Conspiracy to possess with intent to distribute cocaine | 12-16-1998 | 1 |

The defendant is sentenced as provided in the following pages of this judgment.

## IMPRISONMENT

**IT IS THE JUDGMENT OF THIS COURT THAT:**

the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of **135 months**.

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for the periods specified for each count of conviction.

The defendant shall report immediately to the probation office in the district in which the defendant is to be supervised, but no later than seventy-two hours after sentencing. In addition, see the attached page(s) defining the mandatory, standard and discretionary conditions of probation that apply in this case.

## MANDATORY CONDITIONS OF SUPERVISED RELEASE
### (As set forth in 18 U.S.C. § 3583 and U.S.S.G. § 5D1.3)

1)      For any offense, the defendant shall not commit another federal, state or local crime;

2)      for any offense, the defendant shall not unlawfully possess a controlled substance;

3)      for offenses committed on or after September 13, 1994, the defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within fifteen days of release from imprisonment and at least two periodic drug tests thereafter for use of a controlled substance as determined by the court:

         At least two within the first sixty days.

4)      for a domestic violence crime committed on or after September 13, 1994, as defined in 18 U.S.C. § 3561(b) by a defendant convicted of such an offense for the first time, the defendant shall attend a rehabilitation program in accordance with 18 U.S.C. § 3583(d);

5)      for a defendant classified as a sex offender pursuant to 18 U.S.C. § 4042(c)(4), the defendant shall comply with the reporting and registration requirements set forth in 18 U.S.C. § 3583(d);

6)      the defendant shall cooperate in the collection of a DNA sample from the defendant if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 and the Justice for All Act of 2004; and

7)      The defendant shall pay any balance on the special assessment, restitution and/or fine imposed against the defendant.

## STANDARD CONDITIONS OF SUPERVISED RELEASE

1)      For any felony or other offense, the defendant shall not possess a firearm, ammunition, or destructive device as defined in 18 U.S.C. § 921;

2)      the defendant shall not leave the judicial district without the permission of the court or probation officer (travel outside the continental United States requires court authorization);

3)      the defendant shall report to the probation officer as directed by the court or the probation officer and shall submit a truthful and complete written report within the first five days of each month;

4)      the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

5)      the defendant shall provide to the probation officer access to any requested financial information including, but not limited to, tax returns, bank statements, credit card statements, credit applications, etc.;

6)      the defendant shall support his or her dependents and meet other family responsibilities;

7)      the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

8)      the defendant shall notify the probation officer ten (10) days prior to any change in residence or employment;

9)      the defendant shall refrain from excessive use of alcohol;

10)      the defendant shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician, and shall submit to periodic urinalysis tests as requested by the probation officer to determine the use of any controlled substance;

11)      the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

IVAN EBERHARDT
98 CR 946

12)     the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

13)     the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

14)     the defendant shall notify the probation officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;

15)     the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

16)     as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

17)     if this judgment imposes a special assessment, restitution or a fine, it shall be a condition of probation or supervised release that the defendant pay any such special assessment, restitution or fine in accordance with the court's order set forth in the Criminal Monetary Penalties sheet of this judgment.

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE

The defendant shall also comply with the following additional conditions of supervised release:


The defendant shall participate in a drug aftercare program approved by the probation officer, which may include residential program for treatment of a narcotic addiction or drug or alcohol dependency and/or testing for detection of substance use or abuse.

IVAN EBERHARDT
98 CR 946

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the "Schedule of Payments." Unless waived, the defendant shall pay interest on any restitution and/or fine of more than $2,500, unless the restitution and/or fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). The payment options may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

| Total Assessment(s) | Total Fine | Restitution | Mandatory Costs of Prosecution |
|---|---|---|---|
| $100.00 | Fine Waived | $ | $ |

The defendant shall notify the United States Attorney's Office having jurisdiction over the defendant within thirty days of any change of name, residence or mailing address until all special assessments, restitution, fines, and costs imposed by this judgment are fully paid.

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons as notified by the United States Marshal.  Defendant is bond pending appeal.

# RETURN OF SERVICE

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____.


By:_____
(Signature)

Name (Print)_____

Title (Print)_____

Date of Imposition of Judgment/Sentencing: April 22, 2005

JAMES B. ZAGEL
UNITED STATES DISTRICT JUDGE

Dated at Chicago, Illinois this 25th day of April, 2005

IVAN EBERHARDT
98 CR 946

## STATEMENT OF REASONS
### [NOT FOR PUBLIC DISCLOSURE]

Defendant's Last Known Address:        1029 Patricia Lane
                                       Crete, IL 60417


DOB:              03-21-1969
USM #:            03796-424
SSN:              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

THE COURT ADOPTS THE PRESENTENCE REPORT AND GUIDELINE APPLICATIONS BUT WITH THESE CHANGES:

**Chapter Two of the U.S.S.G. Manual** determinations by court (including changes to base offense level or specific offense characteristics): Reduction in base offense level on court determination of lesser distribution amount.

## SPECIFIC SENTENCE IS IMPOSED FOR THESE REASONS

The guideline range is reasonable and while the offender is typical, the offense is milder than the typical offense so the sentence is lower that the middle of the Guideline range.

## GUIDELINE RANGE DETERMINED BY THE COURT (BEFORE DEPARTURES):

Total Offense Level: 32

Criminal History Category: II

Imprisonment Range: 135 - 168 months

Supervised Release Range: 3 - 5 yeas

Fine Range: $17,500  - $4,000,000

Fine waived or below the guideline range because of inability to pay.

## THE SENTENCE IS WITHIN A GUIDELINE RANGE, THAT RANGE EXCEEDS 24 MONTHS, AND THE SPECIFIC SENTENCE IS IMPOSED FOR THESE REASONS:



JAMES B. ZAGEL
UNITED STATES DISTRICT JUDGE

Dated at Chicago, Illinois this 25th  day of April, 2005

EXHIBIT C

SENTENCING TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
            vs.                    )  No. 98 CR 946
                                   )
IVAN EBERHART,                     )  Chicago, Illinois
                                   )  Friday, April 22, 2005
            Defendant.             )  10:30 o'clock a.m.
                                   )  Room 2503

REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL

APPEARANCES:

For the Government:        MR. PATRICK J. FITZGERALD
                           UNITED STATES ATTORNEY
                           219 South Dearborn Street
                           Suite 500
                           Chicago, Illinois  60604
                           BY: MR. AMARJEET BHACHU

For the Defendant:         MR. LEONARD GOODMAN
                           53 West Jackson
                           Suite 1460
                           Chicago, Illinois  60604

Also Present:              US PROBATION
                           55 East Monroe Street
                           Suite 1500
                           Chicago, Illinois  60603
                           BY: MR. TODD McKECHNIE

Court Reporter:            MR. ANTHONY W. LISANTI
                           United States Courthouse
                           219 South Dearborn Street
                           Chicago, Illinois 60604
                           (312) 939-2092

1             THE CLERK:  98 CR 946.  The United States

2    versus Eberhardt.

3             MR. BHACHU:  Good morning, your Honor.

4    Amarjeet Bhachu on behalf of the United States.  The

5    last name is spelled BHACHU.

6             MR. GOODMAN:  Good morning, your Honor.

7    Leonard Goodman on behalf of Ivan Eberhardt who is here

8    in Court.

9             THE COURT:  I see him.

10            MR. McKECHNIE:  Todd McKechnie here on behalf

11   of the Probation Office.

12            THE COURT:  I have in front of me the

13   presentence investigation report and an addendum to that

14   report prepared at some time in the past.  I have a

15   supplemental sentencing memorandum and the motion for

16   bond pending appeal.

17            Leaving aside letters from individuals, is

18   there anything else I should have?

19            MR. BHACHU:  I don't believe so, your Honor.

20            MR. GOODMAN:  No, Judge.

21            THE COURT:  Mr. Goodman, you and your client

22   have both obviously read the presentence report and the

23   addendum?

24            MR. GOODMAN:  Yes.

25            THE COURT:  Other than what has been recited in

1    the papers there attached, and the supplemental

2    sentencing memorandum, are there any other corrections

3    or adjustments you want to make with respect to the

4    report?

5            MR. GOODMAN:  I don't believe so.

6            THE COURT:  If that is the case, we will begin

7    with the Government.

8            MR. BHACHU:  Your Honor, just in perspective.

9    The factors in aggravation and mitigation in this case

10   -- this was, as your Honor probably recalls, a cocaine

11   conspiracy case.  The defendant was apprehended -- well,

12   it was through the course of the investigation where the

13   police first began with a surveillance operation of a

14   house.  They found an individual who delivered some

15   cocaine to that location.  They subsequently stopped

16   that individual after he had delivered two kilograms of

17   cocaine to that house.  That individual, Charles Bolden,

18   agreed to cooperate with the Government.

19           Charles Bolden made a number of recorded

20   phone calls, to source of supply "E", and subsequently

21   arranged for meeting with Ivan Eberhardt.  At that

22   meeting, Mr. Bolden got into a car with Mr. Eberhardt

23   and they had a conversation after Mr. Bolden had entered

24   the car.  It was very clear from that conversation that

25   Eberhardt was very interested to know what the DEA had

1  presence of a scale and a high-speed money counter and,

2  I believe, "Blank", if I remember correctly.

3          Mr. Eberhardt decided to go to trial.  At

4  trial he was convicted of conspiring to distribute more

5  than five kilograms of cocaine.

6          In terms of aggravation, Mr. Eberhardt in

7  addition to that offense admitted that he actually

8  transacted quantities of twenty to forty kilos of

9  cocaine a month.  Mr. Bolden, in a separate statement,

10  indicated that he got between six and seven kilograms

11  from Mr. Eberhardt on a monthly basis.  Clearly the

12  defendant was involved in moving a substantial amount of

13  cocaine during the time he was involved in this

14  conspiracy.

15          With respect to his prior record, Mr.

16  Eberhardt doesn't have a clean record.  This isn't a

17  case where we have an individual that has a spotless

18  record, that was perhaps led astray or made a wrongful

19  decision.  Not only did he admit to us that he had been

20  transacting cocaine for at least a month prior, but his

21  record indicates that he has been previously convicted

22  of driving under the influence.  He also has a UUW

23  conviction.  He has multiple arrests, some of them

24  involving controlled substances including cocaine.  He

25  has been arrested several times for disorderly conduct.

1    There is also a battery arrest as well.

2                    In connection with that, the presentence

3    report indicates that Mr. Eberhardt has, on occasion,

4    engaged in battery of women.  His former wife indicated

5    in her statement to the Probation Officer that abuse by

6    the defendant started the day they were married, and

7    that she had frequently had her eyes blackened by the

8    defendant.

9                    There is another report or another

10   indication from Ms. Wilson, who at some point, I

11   believe, had a relationship with the defendant, where

12   she actually filed a complaint against the defendant.

13   The police arrived, and her complaint indicated that she

14   had suffered physical abuse.  That the defendant had

15   punched her in the nose and that the defendant had also

16   bitten her on the head as well.  So this is not a

17   defendant who made one poor step or has demonstrated

18   that he has strong moral character.

19                   He also indicated in the presentence

20   report that at a prior period of time he drank

21   excessively.  All of these things indicate that the

22   defendant does not have good moral character.  He is a

23   threat to the community in general.  He has an extensive

24   criminal background.

25                   Moreover, the defendant has not accepted

1    responsibility for this offense.  The latest papers

2    filed by counsel persist in the notion that this case

3    was concocted against the defendant despite the fact

4    that we have these taped conversations where the

5    defendant quite clearly is talking about Mr. Bolden's

6    involvement with the DEA, what was going on with the

7    DEA.

8            At one point Mr. Bolden during the course

9    of the conversation says to Mr. Eberhardt -- you know,

10   you must think that I am tapped or that I have got a

11   wire.  The response that Mr. Eberhardt gives quite

12   clearly demonstrates that he understood what was going

13   on and what he was doing.  He was not an innocent party

14   in this case at all.

15           There is some suggestion in the letters

16   that I have seen today, and some submissions by counsel

17   for the defendant, that the defendant has a number of

18   children.  He is now employed; however, I would note for

19   the Court that under 5H1.5 and .6, employment records

20   and family obligations generally are not grounds for a

21   departure.  Moreover, to the extent that the defendant

22   has been able to conform his conduct to the law since

23   the time he was convicted, I would submit that any

24   rehabilitative efforts that he was engaged in since he

25   was convicted should not be considered by the Court.

8

1           Now as your Honor is well aware, the
2    Guidelines are no longer mandatory.  They are advisory.
3    The Government's position, as your Honor is also aware,
4    is that any sentence handed out by this Court should be
5    consistent with and within the Guideline range.  The
6    reason for that is that the Guidelines were enacted in
7    order to ensure that there were not disparate sentences
8    handed out to defendants, depending on which Court they
9    appeared before and what date they were sentenced.
10          The Congress, when they actually passed
11   the sentencing Guidelines, indicated that the sentencing
12   scheme that existed prior to the initiation of the
13   Guidelines was unjust, because it either resulted in a
14   sentence that was too high with respect to any
15   defendant, when compared to a similarly situated
16   defendant, or it resulted in a sentence that was too
17   low, thus being unfair to the public.  Congress went so
18   far as to call the system of indeterminate sentencing
19   shameful..
20          It would be the Government's position that
21   a deviation from the Guidelines would be unreasonable,
22   and also that it would be unfair to the public where
23   other defendants, similarly situated to this defendant,
24   must, in fact, face a sentence within the Guideline
25   range.  There are no extenuating circumstances to

1   justify a departure from the Guideline range in this

2   case.

3           In terms of factors in mitigation, your

4   Honor, I am always ready to admit when such exists.  I

5   am hard-pressed to find any in this case.  I do concede

6   -- I have talked to counsel before today -- that the

7   defendant, since the time of his conviction, has not

8   fled.  He has appeared at proceedings before this Court.

9   I notice that he did appear for his appellate argument

10  as well.  I guess it can be said that he has not

11  subsequently been involved in any criminal conduct.  But

12  beyond that there isn't much in the way of mitigation in

13  this case that I could see.

14          For that reason, we recommend that a

15  sentence within the advisory Guideline range be imposed

16  upon the defendant.  Even considering the Guideline

17  range, I would note that the Probation Report indicates

18  that the Guideline range is a level thirty-six.  In this

19  case it is category two.  That is a conservative

20  estimate.  Level thirty-six actually could be a level

21  thirty-eight, were we to take the defendant's statements

22  at face value that he was actually transacting in

23  quantities of cocaine of twenty to forty kilograms at

24  month.

25          Mr. Meza, I defer to his judgment, though

1    he is no longer with the office, indicated that the

2    conservative approach in this case would be to look at

3    the evidence and interpret that to result in a Guideline

4    range of thirty-six.  So a base offense level of thirty-

5    six for this offense.  That being said, I think a

6    sentence within that range would be appropriate.

7                THE COURT:  Mr. Goodman.

8                MR. GOODMAN:  I do have some comments that I

9    would like to make in response to Mr. Bhachu.  But I

10   also have two witnesses who wanted to testify.  Would

11   this be a good time to hear from them?

12               THE COURT:  Sure.

13               MR. GOODMAN:  I think the first witness would

14   be Lemanda Wilson.

15               THE COURT:  Can we do this from the lectern?

16               MR. GOODMAN:  Yes.  That's fine.

17               THE COURT:  Mr. Walker.

18

19               L E M A N D A   W I L S O N,

20   having been duly sworn, called as a witness on behalf of

21   the defendant, testified as follows:

22

23                              EXAMINATION

24   BY MR. GOODMAN:

25   Q.  Please state your name?

Wilson - direct                    11

1    A.    Lemanda Wilson.

2    Q.    How do you know Ivan Eberhardt?  And for how long

3    have you known him?

4    A.    I have been knowing Ivan Eberhardt for eighteen

5    years.  We have three children together.

6    Q.    After you had the children, you were separated for

7    a period of time, is that right?

8    A.    Correct.

9    Q.    Now are you back together?

10   A.    Correct.

11   Q.    Do you have plans to marry?

12   A.    Correct.

13   Q.    Tell me about the three children.  What are their

14   names and ages?

15   A.    Markesa Eberhardt, age fourteen, Marshana

16   Eberhardt, age thirteen, and Ivan Eberhardt, age twelve.

17   Q.    Tell the Judge about Ivan's relationship with his

18   children.  Does he have a close relationship -- how much

19   time does he spend with them?  Does he provide financial

20   support for them?

21   A.    Yes.  Ivan has a relationship with our children on

22   a daily basis.  He has provided for our children since

23   birth.  Financially, mentally.  He just helps.  He has

24   always been in our children's lives.

25   Q.    Would it be a substantial hardship on the children

Wilson - direct                    12

1    and on yourself if Ivan were incarcerated for a long
2    period of time?
3    A.   Yes, it would.  At this time Ivan is helping me
4    tremendously with the children.  Because now they are
5    getting older.  They are changing.  I am changing.  He
6    is helping me around the house.  Right now financially
7    he is helping me as they are getting older.  We have a
8    bigger responsibility now; in which I alone can't do it.
9    Right now we are splitting everything down the middle.
10   He is doing as much as he can.
11   Q.   Do you work?
12   A.   Yes, I do work.  But my income alone does not
13   provide for me and the three children.
14   Q.   What kind of work do you do?  Is it full-time work?
15   A.   Yes, it is full-time work.  I am an administrative
16   assistant with the City of Chicago, Consumer Services.
17   Q.   How would you manage with Ivan in prison?
18   A.   Actually, I would have to get a second job as I did
19   before.  His family was a big help to me.  My mom was a
20   great help to me also while he was gone.
21   Q.   Mr. Bhachu mentioned some abuse.  Is Ivan abusive?
22   Has he been abusive to you in the last five years?
23   A.   No, sir.
24   Q.   Is there anything else you want to tell the Judge
25   about Ivan's character or his relationship with you or

Wilson - direct                                    13

1    with his children?

2    A.   Again, your Honor, we are a family.  I feel that

3    our children need to stay with both parents and a

4    family.  Because he is very close to my children, not

5    only my three, he is also close to his children that he

6    had in former relationships.  Although what the

7    gentleman stated was true, in time things change, people

8    change.  We have a healing process.  We just need him in

9    our lives right now.

10   Q.   I meant to ask you -- Ivan has two other children,

11   is that correct?

12   A.   Correct.

13   Q.   Is he involved with their lives as well?

14   A.   Yes.  The oldest one, not only is he involved in

15   their lives, I am, too, with the rest of my children.

16   They have a great relationship.  She has a relationship

17   with my immediate family, my mom, my aunt -- just very

18   close to me.  And he also has a younger child which he

19   supports and has always supported, which he has by his

20   wife.  I feel he is doing a great job.

21             MR. GOODMAN:  Thank you.

22             Nothing further.

23        THE WITNESS:  Thank you.

24             MR. BHACHU:  No questions, your Honor.

25             THE COURT:  Your next witness.

```
 1
 2           R E G I N A    R O G E R S    R A Y M O N D,
 3    having been duly sworn, called as a witness on behalf of
 4    the defendant, testified as follows:
 5
 6                             EXAMINATION
 7    BY MR. GOODMAN:
 8    Q.    Please state your name for the record?
 9    A.    Regina Rodgers Raymond.
10    Q.    How do you know Ivan Eberhardt?
11    A.    Ivan is a contractor for a building that I manage.
12    I have been there for six years.  We occupy senior and
13    disabled residences.
14    Q.    How long has he worked for you?
15    A.    I met Ivan in 2003.
16    Q.    Shortly after he was put back on bond?
17    A.    Perhaps.  Correct.
18    Q.    Can you tell the Judge what Ivan has been doing
19    when he is not at home, for the last two years?
20    A.    The building that I manage occupies one hundred and
21    sixteen units.  We monthly have units that need to be
22    recycled, as far as decorating and painting.  He
23    installs cabinets, floors, baseboards, paints --
24    whatever the unit needs to bring it up to the Federal
25    Code.
```

1    Q.    How many hours a week does he work for you?

2    A.    He works eight hours a day.

3    Q.    Have you found him to be trustworthy — reliable —

4    honest?

5    A.    The reason why I say "yes" is because we have units

6    that are occupied with senior disabled.  They are fully

7    occupied.  We have one hundred percent occupancy.  A lot

8    of the units that he has to go into are occupied with

9    the tenants' personal belongings.

10   Q.    Have you had any incidents?

11   A.    Never.

12            MR. GOODMAN:  Nothing further.

13            MR. BHACHU:  No questions, your Honor.

14            THE COURT:  Thank you.

15            MR. GOODMAN:  I don't believe we have anybody

16   else, unless there is anyone else that needs to say

17   anything —

18            THE COURT:  Do you have additions to your

19   statement, Mr. Goodman?  I see that you have one person.

20

21                  M A R Y   G R I F F I N,

22   having been duly sworn, called as a witness on behalf of

23   the defendant, testified as follows:

24

25                         EXAMINATION

1    BY THE WITNESS:

2    A.   I am Mary Griffin.  I am Ivan's aunt.  I have known

3    Ivan all of his life.

4         I want to say that Ivan is an exemplary young

5    man.  He is an inspiration to the entire family.  As he

6    has gone through this trial, for the last eight years,

7    we have looked to him for inspiration for us.  He has

8    never lost his spirit and hope.  He has never lost his

9    spirit of love, in raising a family.

10        Ivan is a hard worker.  He is a faithful

11   believer.  He is in church religiously, Sundays and

12   throughout the week.  He serves in his church.  He

13   serves in his community.  He serves the family.  He is a

14   wonderful father.  He is an extraordinary friend and he

15   is a nephew that I feel has been a blessing to me and to

16   the entire family.

17        I plead with your Honor to take into

18   consideration Ivan's willingness and his demonstration

19   to change whatever behaviors there may have been in the

20   past and to also consider some of the injustices, from

21   my perspective, the unfairness of the proceedings that

22   have been against him thus far.

23        Ivan, he deserves a chance to be the young

24   man that I know he can be.  And I thank you.

25        MR. GOODMAN:  Thank you.

1              Excuse me, Judge.  There is one more.

2

3              S T E V E N    H A R R I S,

4    having been duly sworn, called as a witness on behalf of

5    the defendant, testified as follows:

6

7                        EXAMINATION

8    BY THE WITNESS:

9    A.   My name is Steven Harris.  I am representing the

10   Brothers, from the Apostolic House of Prayer, the

11   Brotherhood.  I am the secretary for the Brotherhood,

12   but we are making transitions right now.  I don't know

13   what position I am going to be in next.

14              I'm coming up on behalf, to speak on Ivan

15   Eberhardt for the Brothers.  I have known him about five

16   - six years.  You know, to me, I never noticed anything

17   unusual about the Brother, no threats.  He was always a

18   gentleman to me and the Brothers, always helping.  He is

19   involved in the church.  We were just with each

20   Wednesday at Bible study.  You know, his kid was there

21   Sunday in church.

22              I am kind of -- I ain't going to talk about the

23   case.  I don't know what is going on with that.  You

24   know, to me, I think it is a mistake, something is not

25   right in it.  But I just see the Brother, you know, a

Harris - direct                    18

1   family man, a strong support to his family.  He set a
2   good example around the church because other brothers
3   are looking at him, because you have got all the kids
4   looking for strong me today.  Honestly speaking, you
5   don't have too many strong black men.
6          I just don't represent anybody.  I have to see
7   something in anybody for me to stand and speak on behalf
8   of anybody or support somebody in a situation like this.
9   The reason why I am here to speak on behalf of him is
10  because I see a lot in the Brother.  I never felt like
11  he was a threat to anyone.  I never felt like he was
12  involved with anything that is unusual.
13         In the times that we have been together, you
14  know, he drove me home before.  We sat outside of the
15  church.  Me and his mother was the editor of a
16  newsletter.  He would come by sometimes.  He would put
17  his input.  He used to put information inside the church
18  newsletter, different articles also.  At times he would
19  sit down with us and help us with the newsletter.
20         In that period of time I just noticed -- I
21  thought that when this was going on it was kind of a
22  surprise to me.  in the time that I had known him, he
23  was like to me -- to me I look at him as a powerful
24  young Brother.  His kids love him very much, his wife,
25  his girl, you know, they hang very tightly in church.

Harris - direct                    19

1          Like I say, he is a good example, a good role
2     model for us.  We all stood up on behalf of him Sunday.
3     It was about fifty Brothers around with him, praying
4     with him, you know.  We even signed a petition on behalf
5     of him, all of the Brothers.  A lot of Brothers couldn't
6     make it.  I just told the Brothers, honestly speaking,
7     man, I just believe, I think me personally, I think it
8     would be a mistake for a Brother like this man to be
9     separated from his family and his kids.  Because we need
10    our fathers out there.  You know, the kids need their
11    fathers.  There is so much going on in our communities,
12    with the drugs and alcohol and things that are not going
13    right.
14          I look at his kids, you know, and his kids
15    cling onto him.  They hold onto him for guidance and
16    help.  A lot of times -- we got a lot of strong mothers
17    out here, but sometimes they can't do it all on their
18    own.
19          I represent the Brothers -- there is a lot more
20    I could say.  I am just representing him because I love
21    the Brother.  I am speaking on behalf of other Brothers.
22    I am standing by his side, knowing in my heart that
23    something about this is not right.  The Brother ain't
24    been making no mistakes, he just said in the past few
25    years, or whatever.  Everybody makes mistakes.  We all

I. Eberhardt - direct                    20

1    got skeletons in the closet somewhere.  But when we walk

2    openly, and not commit anything or do anything wrong,

3    then you are proving yourself.

4         Like I said, I think it would be a disaster to

5    separate a Brother from his family and his children.

6    Like I said, there is a lot more I can say but honestly,

7    I just wish we all just really honestly think about this

8    decision.  This is not just dealing with one life, but

9    it is dealing with many lives.

10        Like I said, I think that he is not just a man

11   out here doing things that is not right -- that is

12   wrong.  He is not a threat to the community.  Like I

13   said, I honestly wish that we make an honest decision

14   and really think about this.  Like I said, I think, from

15   what I know about it, I think it will be a mistake.  I

16   still believe in my heart there is omethign that is not

17   right.  Because to me he has proven himself as a man,

18   and not just a man but a man of God, too, and as a

19   powerful figure in church as well as with his kids and

20   as a friend.

21        That is all I have to say.  Thank you.

22        MR. GOODMAN:  Thank you.

23        THE COURT:  Thank you.

24        MR. GOODMAN:  The defendant's brother wants to

25   say a few words.

1

2                I R W I N   E B E R H A R D T,

3     having been duly sworn, called as a witness on behalf of

4     the defendant, testified as follows:

5

6                          EXAMINATION

7     BY THE WITNESS:

8     A.   My name is Irwin Eberhardt.   I am Ivan's older

9     brother.

10               Ivan has always been a good friend to me and he

11    has been a role model for my children as well.   I have

12    two children who are twelve and thirteen.   They look up

13    to their uncle and they love their uncle.

14               As was said before, Ivan means a lot to many

15    people, especially to myself and my family, obviously.

16    I plead with the Court to consider that.   I believe the

17    purpose of the law is to be corrective, per se, and I

18    think he has shown over this period that he spent with

19    the punitive times, he has shown that he has been

20    corrective and he is a good man and capable of doing

21    good things with good people.   It would be devastating

22    to the community and to myself personally, my family and

23    my children if we were without him.

24               Thank you, your Honor.

25               THE COURT:   Thank you.

1              Any final remarks, Mr. Goodman?

2         MR. GOODMAN:  Yes, Judge.

3              I would like to speak to two issues.  One

4    is the quantity issue and then it is the mitigation

5    issue.

6              First, it is our position, Judge, that you

7    are not bound by the jury's finding of five kilos; for

8    two reasons.  One, it is my understanding that the jury

9    -- you may correct me if I am wrong -- the reason that

10   the jury makes a quantity finding is to determine

11   maximum sentences for Apprendi.  They are not binding on

12   the Court with respect to mandatory minimums.  That is

13   my understanding.  I haven't seen the case law that

14   speaks directly to that.

15             Secondly, I think that in this case I

16   would ask the Court to consider the evidence --

17   certainly this Court has the power to set aside a jury

18   finding not supported by competent evidence.  I think

19   that this is such a case.

20             I just want to briefly go through what was

21   the evidence that supports a finding that Ivan Eberhardt

22   is a multi-kilo drug dealer.  The first piece of

23   evidence that you heard at trial was hearsay from

24   Charles Bolden.  There is more hearsay that has been

25   presented at sentencing about what Bolden said.  I would

1   remind the Court that Mr. Bolden gave five different

2   stories to the Government.  He was deemed so unreliable

3   that Mr. Meza made a strategic decision that he could

4   not use him at trial and instead went to trial with no

5   witnesses to identify Ivan as a drug dealer.  That is a

6   pretty strong statement from the Government that this

7   witness is not reliable.

8              I would urge the Court, if the Court is at

9   all moved to consider Bolden's statements, take a look

10  at the various versions of his story.  They are all in

11  the exhibits in the motion for a new trial.  There is

12  five different statements that he gave and each one

13  changes dramatically.  In fact, in some of these

14  statements the agent that is taking the statement writes

15  -- the witness admits that he lied before and witness

16  changes his story.  It is very unusual to see comments

17  like that in a statement taken by the DEA.

18             The second piece of evidence that you

19  heard a trial was the tapes.  I will remind the Court

20  that these tapes were admitted -- they were tapes

21  between Ivan and a cooperating witness -- they were

22  admitted basically like a confession.  The cooperating

23  witness was trying to get Ivan to say things that would

24  incriminate himself.  You will recall that there is

25  nothing on those tapes where Ivan admitted selling

1    kilograms of cocaine.  The discussions are about Charles
2    Bolden's encounter with the DEA which Charles Bolden was
3    telling Ivan about.  There is nothing on those tapes.
4    In fact, the tapes are so worthless that the Government,
5    at trial, argued to the jury that the reason Ivan never
6    talks about selling kilogram quantities of drugs on the
7    tape is because he wanted a face-to-face meeting.  Your
8    Honor will recall that they pointed to a comment to put
9    words in the lips of Ivan Eberhardt that he never said.
10   It was established later, in fact, he never made that
11   request for a face-to-face meeting.  So the tapes are
12   worthless with respect to evidence of quantity.
13          That leaves only Ivan's statement, his
14   post-arrest statement to the DEA.  Just very briefly,
15   Judge, I would like to refresh the Court's memory about
16   those statements.  This was after Ivan was arrested.
17   This was shortly before Christmas in 1998.  He initially
18   denied being involved with drugs.  The agents explained
19   to him that his only hope of being released was to
20   convince them that he would be useful to them on the
21   outside and that he could, in fact, help them get
22   another drug dealer.
23          When he refused to cooperate, he was
24   locked in a holding cell.  Eventually he agreed to talk
25   about a person that he knew who was a drug supplier

1  named "Tommy".  He drove around with the agents and he
2  pointed to a house that he said was the house where
3  Tommy lived and delivered drugs.  They then let Ivan go
4  home and get a phone number to contact Tommy.  He came
5  back the next day with this phone number, made a series
6  of phone calls.  The agents asked him to try to arrange
7  a transaction.  He was unable to do so.  The cooperation
8  fell apart.
9            After all this, and it took three days,
10  after all this the agents could produce no notes, no
11  record of any statement that he made during those three
12  days and filed a report four months later that he made
13  all of these admissions.
14            In addition, Judge, the circumstances
15  under which the post-arrest statements were made do not
16  suggest reliability.  This is not a baring of the soul
17  confession.  This is a witness that has been scared when
18  they are saying -- your only chance of going home is to
19  help us get somebody else.  That is not a situation that
20  would give comfort and reliability in sentencing
21  somebody to a long period of time.
22            Secondly, the Government has conceded at
23  trial that it could not corroborate a single statement
24  in his post-arrest statement.  It could not identify
25  Tommy.  It could not even prove that there was such a

1   person as Tommy.  Tommy's phone number, that Ivan used

2   to contact him, was actually registered to a person

3   named "Juan Martinez".  Ivan's own phone records showed

4   no prior contacts with this person that is supposedly

5   his regular supplier.

6                What about the defendant's other

7   suppliers?  In the statements apparently he said he had

8   three suppliers.  He had three customers.  One of them

9   was Bolden.  The Government was never able to

10  corroborate that he had any customers.

11               There is no evidence that the defendant

12  ever possessed any of the trappings of a drug dealer.

13  He never was found with drugs, scales, baggies, cutting

14  agents, weapons, fancy cars, jewelry -- in fact, the

15  Probation Officer determined that he has a negative net

16  worth of about $18,900.

17               The Probation Officer mentions two items

18  of corroboration, which are, in fact, entirely innocent

19  corroboration.  They mentioned the phone records showing

20  contacts between Ivan and Charles Bolden.  But your

21  Honor will recall that there was undisputed testimony

22  that the two of them had a relationship, a social and a

23  business relationship.

24               Judge, if Ivan were a murder suspect and

25  he was told that he was going to get the death penalty

1    unless he could confess to other murders and he
2    confessed -- he said I committed sixteen murders -- no
3    one would suggest that that was a reliable statement
4    unless it can be corroborated in some way.  But for some
5    reason in drug cases they throw these numbers out there
6    and the Government asks the Court to believe them and
7    sends somebody away for ten years.  I think it is not
8    going too far out on a limb for the Court to say, the
9    Government should bring you some solid reliable evidence
10   that this man was a multi-kilogram drug dealer.
11            Just a couple of other comments on this.
12   You will also recall that many of the statements, in his
13   post-arrest statement, were, in fact, shown to be false.
14   For example, he admitted, allegedly, that he delivered
15   two kilograms of cocaine to Charles Bolden on the
16   evening of December 14.  Yet five witnesses say he was
17   at home that night.  There was a burglary at his home.
18   The jury, in fact, believed those five witnesses.
19            The defendant also claimed that he had a
20   prearranged ten kilo transaction with Tommy.  He told
21   the agents, yes, I have got it all set up, I can help
22   you guys.  That was false.  There was no prearranged
23   delivery.  He couldn't make any transaction with this
24   fellow purporting to be Tommy.
25            The law is clear that the defendant has

1    the right to be sentenced only on reliable evidence.

2    This is not such a case.  There is other statements in

3    his post-arrest statement that are inherently

4    implausible.  For example, he claims that he is a multi-

5    kilogram drug dealer yet he earns two hundred and fifty

6    dollars for every kilogram he sells.  That is a one

7    percent markup.  Again, this is a preposterous

8    statement.

9           In my written filings I mention the case

10    of United States versus Robinson where the Seventh

11    Circuit found clear error to rely on inherent and

12    unreliable statements, which if believed would have the

13    defendant's customers paying higher prices when they buy

14    larger quantities.  This Court certainly has the

15    discretion to demand that there be some reliable

16    evidence before you that this man is a multi-kilogram

17    drug dealer, besides just desperate claims from a man

18    that is locked up and trying to earn his freedom.

19           Judge, no one is saying that Ivan has not

20    made mistakes, or that he is an angel.  Clearly, he has.

21    Clearly, anyone who was hanging out with Charles Bolden

22    back in 1998 was not leading an exemplary life, the life

23    that you have seen he has been leading in the last seven

24    years.  But to sentence a person as a multi-kilo drug

25    dealer the Court should demand some solid evidence.  It

1    is simply lacking here.

2                    I would ask the Court to set aside the

3    jury's five kilo finding and to sentence the defendant

4    based only on quantities that were actually proven.

5                    I should say one other thing on this.

6    That is, this issue was preserved.  I know that is an

7    issue, but this issue was preserved in attorney Don

8    Levy's initial filing which was within the seven days,

9    he did raise the point that there was insufficient

10    evidence to support the jury's finding of the five

11    kilos.

12                    The Court does have the power and does

13    have the discretion to set aside that finding and I

14    would urge you to do so.

15                    With respect to Ivan's post-offense

16    rehabilitation.  This is what we are asking the Court to

17    consider.  A departure from the Guidelines, or an

18    argument for the Court to exercise its discretion.

19                    This offense occurred in 1998, seven years

20    ago.  The defendant has been on bond for the better part

21    of six years.  On two separate occasions this Court has

22    found him worthy of the Court's trust.  I think you can

23    see from the witnesses and from the letters before you

24    that he has not let you down.  He was first on bond from

25    January of 1999 through April, 2002.  He worked as a

1     carpenter for three different companies.  He supported

2     his children.  He spent time with his children on the

3     weekends and on their vacations and in the summer.  He

4     helped organize youth activities.  He obeyed all of the

5     conditions of his bond.  In fact, in July of 2003 the

6     pretrial officer recommended termination of the

7     electronic monitor.

8               The Court will recall that in April of

9     2002 he was convicted, incarcerated for thirteen months.

10    While he was in jail there were no incidents.  I think

11    that is important, too.  No incidents, no complaints.

12    He led Bible study classes at the MCC and at the Dodge

13    County Jail.

14              After his second release, he has now

15    gotten back together with the mother of his children who

16    you heard from today.  He is supporting them,

17    emotionally and financially.  With the help of his boss,

18    he has also started his own business, which is a repair

19    business for apartment buildings.

20              Judge, you have a lot of letters before

21    you.  I actually have some more.  If I may, just to

22    highlight a couple of statements from some of the

23    letters.  I should give you these -- maybe just to save

24    them.  I can just highlight a couple of statements that

25    I would ask the Court to consider in some of these

1    letters.

2    Nora Ellington Hill says -- an outstanding

3    young man, quiet and gentle.  Derrick Ellington -- young

4    African men have few role models.  Ivan is an excellent

5    son to his mother and father to his children.  His

6    family needs him and depends on him.

7    Ivan is a role model, professional in his

8    business, fair in price and conscientious.  He is needed

9    in the community.

10    Although his life has been overshadowed by

11    his legal battles, he has nonetheless sustained an

12    honorable work ethic, and an unwavering sense of

13    commitment and responsibility to his family.

14    Diligent worker, involved with the church

15    activities.  Comes from a Christian family of working

16    class people with strong family ties.

17    Judge, I think that there is a theme from

18    these letters.  That is that the kind of person that

19    Ivan was in 1998 is not the person that stands before

20    you today.  This is an unusual situation where you have

21    seven years of experience with somebody post-offense.

22    This is a man who has completely turned

23    his life around.  He has become a productive member of

24    society.  Taking care of his children.  He demonstrated

25    his rehabilitation with deeds and not talk.  For Mr.

1    Bhachu to say that he can't see any mitigating
2    circumstances in this case, I find that to be shocking.
3    If he doesn't see it, he is unwilling to look because
4    this is a man that has turned his life around.  A prison
5    sentence at Government expense only takes from society;
6    it doesn't give.  Someone is going to have to take care
7    of his kids and his wife.
8              Also, Judge, when you see this type of
9    support for a young man, I think that can give the Court
10   some comfort that when he goes back to his community
11   there is people there to make sure that he never slips
12   up again.  These are people that are willing to stick
13   their necks out for him and they are asking your Honor
14   to do the same.
15             Thank you.
16        MR. BHACHU:  Your Honor, just a couple of quick
17   comments.
18             With respect to the extensive discussion
19   that has been had about the defendant's employment
20   record and his family ties and responsibilities.
21   Section 5H1.5 of the Guideline provides that an
22   employment record is not ordinarily relevant in
23   determining whether a departure is warranted.  Moreover,
24   in sentencing a defendant convicted of an offense other
25   than the offense described in 5H1.6, family ties and

1  responsibilities are not ordinarily relevant in
2  determining whether a departure may be warranted.
3  So when I say there aren't many mitigating
4  circumstances, I say that in light of the fact that the
5  Sentencing Commission has determined that one should not
6  get the benefit of a lower sentence based upon one's
7  family ties, responsibilities or employment history.
8  The reason that is, so that defendants in similar
9  situations convicted of similar crimes are not
10  distinguished against based on what their family
11  responsibilities are.  It is all part of a system where
12  people get uniform sentencing in this country.  Congress
13  has indicated that that is the policy it wishes to
14  pursue.
15  With respect to the statements that have
16  been made concerning Mr. Eberhardt as a role model, I
17  believe that Mr. Eberhardt's conduct speaks louder than
18  those words.  His conduct over a period of several years
19  indicates that he is not a role model.  He has not been
20  a role model in the past and should not be considered as
21  a role model.
22  There was an extensive period of time
23  spent discussing the evidence at trial.  I find it
24  regrettable that counsel continues to suggest that there
25  was not sufficient evidence in this case to convict the

1   defendant.  Regrettable because in any case that the
2   defendant still does not accept responsibility for his
3   conduct.  Regrettable because it also indicates that the
4   defense believes that law enforcement officers got
5   before this Court, took an oath and lied before this
6   Court under oath on what Mr. Eberhardt said.
7           I believe the evidence is sufficient to
8   sustain the jury's finding.  The time within which to
9   challenge that finding has long since passed.  There is
10  no basis to suggest that this Court may ignore the
11  jury's finding in deciding whether or not that the
12  mandatory minimum sentence may be imposed in this case.
13          That is all, your Honor.
14      MR. GOODMAN:  Can I make one comment?
15          While family ties are ordinarily not
16  relevant, there is case law that says extraordinary
17  post-offense rehabilitation is something that takes a
18  case out of the heartland.
19      THE COURT:  I understand.
20          Mr. Eberhardt, if you want to say
21  something before I impose sentence upon you, this is the
22  time to do it.
23      DEFENDANT EBERHARDT:  Good morning, your Honor.
24  At this time I just would like to take the time to
25  apologize to my family, my friends -- of course, I would

1    not be standing here had it not been for some bad
2    decisions and bad associations.  I have come to terms in
3    the last seven years that a lot of things can be avoided
4    because it would be easy for me to stand here and say --
5    to say that I am perfect, I didn't do it or whatever.
6    But that is in the Court records.  That is arguments
7    held for another day.
8            But what I can say is that by association
9    and by decision that I did make does have me in this
10   situation with regards to even you -- I apologize to you
11   for having to make these decisions on this day which
12   could have been avoided by different types of
13   associations.
14           I mean, I thank everybody for all of the
15   comments that they did make about me.  I have made bad
16   decisions in the past, as we all have.  I do feel,
17   myself, speaking for myself, that I am a changed man.
18   That I am a God-fearing man.  And that my children, I
19   feel they need me and I need them.  My mother, she also
20   needs me, which I don't know are factors that you take
21   into consideration on basing your decision.  But, like I
22   say, I apologize to you for putting you in this
23   position.  I apologize to my family for putting them
24   through all that I have been through in the past seven
25   years and I ask for your mercy, your Honor.

1     I thank you for hearing me.

2    THE COURT:  Let me begin with the technical

3 matters first.  That is the determination of the

4 Guideline.

5     Let me begin by saying that I don't think

6 the agents who testified lied.  But I think actually the

7 principal argument that Mr. Goodman is making is not

8 that they lied, but that what Mr. Eberhardt said cannot

9 be accepted as credible.  The reason it can't be

10 accepted as cedible is because he was under pressure --

11 legitmate pressure -- to enhance his supposed value as a

12 witness to the agents.  And this sort of exaggeration

13 has happened mnay times, if it was an exaggreation, and

14 occurs even in cases in which hthe interrogations and

15 interviews are conducted by the most professional and

16 honest of agents.  That is because the incentive does

17 not come from the agents.  It comes from the situation

18 and from an indidivudal's own perception of what he

19 needs to do.

20     So the question is, since it is, I think,

21 fairly important for the determination of the amount,

22 how much do I credit what Mr. Eberhardt did, in fact,

23 say to the agents?  The only part that I am willing to

24 credit is that he did deal in the drugs and he dealt

25 with them over a period of time.  But from the words

1    alone, I am reluctant to conclude that there is a

2    particular quantity involved, because I have to look

3    elsewhere to find the quantity.

4            The place I look to is the two actual

5    kilos, which don't add up to five kilos, but there are

6    two.  I also look to the fact that there is sufficient

7    evidence, and evidence which would persuade, I think,

8    the jury and would persuade me that there was a

9    continuing relationship with Bolden over a period of

10   time.

11           Bolden, too, I think, is fairly unreliable

12   on quantity issues and fairly unreliable in general; a

13   bad business partner.

14           The other aspects of the attack on what it

15   was that was said to the agents, I think, are accounted

16   for by a variety of circumstances.  It is true that Mr.

17   Eberhardt did not wind up with a lot of money in his

18   pocket.  But one of the great misconceptions of life is

19   that a lot of drug dealers have a lot of money.  Some

20   drug dealers have a lot of money; most don't, which is

21   why an economist from the University of Chicago has

22   noted -- many drug dealers still live with their mothers

23   and have issues of what they can afford.

24           Mr. Eberhardt's stated profits on these

25   transactions are quite consistent with his being a

1    middleman, a relatively low-level middleman.  I don't

2    find anything credible in that.

3         My belief is that the jury was justified,

4    given the evidence it heard, considering at least the

5    statements of Mr. Eberhardt, that he dealt in drugs in

6    some quantities, although not exact ones.  Considering

7    the fact that there were two actual kilograms and

8    considering the fact that there was a continuing

9    relationship, the jury was justified in finding beyond a

10   reasonable doubt that at least five kilograms had been

11   proven.  If the decision were left to me, I would find

12   five kilograms had been proven.  But I am very reluctant

13   to go up to the next level which I think is fifteen

14   kilograms.  I would be profoundly uncomfortable with

15   finding that there were fifteen kilograms -- I think

16   more than fifteen kilograms is the dividing line, which

17   means I calculate the Guidelines differently than the

18   probation report does.

19        Instead of a level thirty-six, a criminal

20   history category two, I believe I am at level thirty-

21   two, criminal history category two, because the drug

22   quantities were two levels above that, which I find to

23   have been proved.  So I am at one thirty-five to one

24   sixty-eight, as opposed to the originally suggested

25   guideline of two hundred and ten months to two hundred

1   and sixty-two months.

2              I do want to comment on the possibility of
3   departure from the Guideline.  In the context of this
4   case no departure can be very far in any event because
5   we have a ten-year mandatory minimum.  So basically it
6   is one hundred and twenty months is the minimum that Mr.
7   Eberhardt can get.  But I do want to comment on some of
8   the things said about him.

9              I received a lot of letters over the years
10  with respect to Mr. Eberhardt about his place in the
11  community and what he has done.  Basically I believe
12  them.  I don't dispute their accuracy.  Whether he did
13  this because he had a "like St. Paul saw the light while
14  riding his horse" or whether he simply was scared
15  straight is immaterial to me.  The fact of the matter is
16  he has done a pretty good job since he got caught.

17             It should be noted that in granting him a
18  new trial I did not make a finding that he was innocent
19  of these charges.  I made a finding that I thought he
20  didn't get a fair trial.  But a jury found, beyond a
21  reasonable doubt, that he was guilty.  And even if there
22  is a reversal and a new trial on appeal, another jury
23  may find the same thing because there is enough evidence
24  to justify that finding.

25             So what I am faced with is a situation

1    which the Guidelines address but which I think needs
2    some more explanation than the cold language in the
3    Guidelines.  That is what you do with somebody who
4    commits a crime, and then frequently, through no fault
5    of his own, a long period of time passes before there is
6    an adjudication and he leads a pretty good life during
7    that time.  In addition to leading a pretty good life,
8    he has people who depend on him and who will suffer if
9    he is sent away.

10           The problem with the people who suffer
11   when somebody is sent away is in the vast majority of
12   cases that is always true.  There is always the family
13   that suffers.  There are frequently children that
14   suffer.  Very few people are completely alone in the
15   world.  Congress has quite clearly dictated that that
16   fact alone does not authorize a departure, and is of
17   limited utility even in concluding what the correct
18   sentence is, absent the Guidelines.

19           The people who support him have seen that
20   he is a good father and a good friend and an honest and
21   decent businessman.  Most people who see this in other
22   persons are quite convinced that this is evidence of
23   their innocence of a variety of things.  But those of us
24   who have spent, by choice or by fate, a significant
25   number of years in the field of criminal justice know

1    that distressingly often you will find, even in the
2    worst criminals, good fathers, good friends, honest
3    workers.  I have seen serial killers who fit that
4    description.
5                    This doesn't mean that being a good father
6    and a good friend is irrelevant.  It simply tells us
7    that it does not mean that they have not transgressed
8    the criminal law.
9                    Another thing that I think is a persistent
10   problem, and it doesn't simply apply to Mr. Eberhardt,
11   it applies to a lot of people in the world, it applies
12   to maybe ninety percent of the people who are sentenced,
13   who talk about making mistakes.  I don't know how the
14   word "crime" got translated and changed into the word
15   "mistake".  But a mistake occurs frequently when you run
16   through a red light, when you add up a column of figures
17   wrong.  But what we are dealing with here is not
18   mistakes; this is a crime.
19                   While we always look to the future when we
20   sentence, the basic reason we sentence is to adjust the
21   balance, the social balance that has been disturbed by
22   the commission of a crime.  And, in a sense, to face it
23   quite clearly, there is an element of retribution, of
24   judgment and retribution in all criminal sentences.
25                   I basically adhere to my view, which I

1    expressed in an opinion, that the defendant ought to
2    have a new trial in this case for the three reasons that
3    I gave in my opinion.  Perhaps if all, of the two issues
4    that the Court of Appeals said were not properly
5    preserved, turn out to be available on appeal, that will
6    be the result -- maybe not.  They have a higher Court
7    and they don't have to agree with me.  But the fact is
8    that I am sentencing him today based on the presumption,
9    which I fully accept, that the jury verdict is correct,
10    supported by evidence beyond a reasonable doubt.  And it
11    is on that basis that I will impose the sentence.
12           Mr. Eberhardt, do you want to step
13    forward, please.  I sentence you to one hundred and
14    thirty-five months in the custody of the Bureau of
15    Prisons.  That is to be followed by a term of supervised
16    release of ten years.  Because of the nature of family
17    obligations, I am waiving any fine, even though I
18    believe you probably have the economic ability to do so.
19    In that sense, I believe I do have the power to depart
20    from the fine on the grounds of family needs.  There is
21    no restitution.  I am assessing one hundred dollars.
22           The special conditions of supervised
23    release are that he report to the Probation Office in
24    the District in which he is released within seventy-two
25    hours of his release.  Let me restate that.  He is to

1    report to the Probation Office in the District to which

2    he is released within seventy-two hours of his release.

3    He may not commit another offense.  Shall follow the

4    standard conditions.  May not possess a firearm or

5    destructive device.  He shall refrain from any unlawful

6    use of a controlled substance and shall participate in

7    drug and alcohol aftercare treatment which may include

8    testing at the direction of the Probation Officer.

9             With that, I will explain to you, Mr.

10   Eberhardt, that you do have the right to appeal the

11   sentence.  In fact, to appeal the conviction.  If you

12   want to do that, you will have to tell Mr. Goodman and

13   he will tell you how to go about doing that.

14            That then leads to the final motion Mr.

15   Goodman has filed, which is a motion for release on bond

16   pending appeal.  I have read the motion, so the US

17   Attorney can respond to that.

18            MR. BHACHU:  Your Honor, my recollection is

19   that the last time the defendant, when the defendant was

20   convicted, his bond was revoked.  I believe there is a

21   presumption in this case, due to the term involved here,

22   that he should be taken into custody.  The issue that

23   has been raised in the motion is that it is likely that

24   this case will result in reversal on appeal and

25   conviction.  Judging by the opinion that was issued by

1    the Seventh Circuit in this case, on our most recent

2    appeal, I believe that to be highly unlikely.  With all

3    due respect, I believe that the Seventh Circuit

4    addressed this issue about the prospect for error and

5    its effect on this trial and it has well indicated that

6    there was no error in this case that would be sufficient

7    to call for a new trial.

8         With respect to the issue of the statement

9    relating to "E" coming into evidence, the Seventh

10   Circuit made note of the fact that the defense counsel

11   actually noted that Eberhardt was the individual who Mr.

12   Bolden was calling.  The Seventh Circuit also noted that

13   there was no Crawford problem in this case whatsoever in

14   its opinion.

15        With respect to the issue of the buyer-

16   seller instruction, this Court suggested that it was

17   perhaps appropriate to issue a buyer-seller instruction.

18   However, the defense at trial, as it appears that it is

19   today, is that the defendant was an innocent bystander.

20   Clearly a buyer-seller instruction, which was never

21   asked for at trial, would be inappropriate and there

22   would be no appeal justifying reversal for the failure

23   to give a buyer-seller instruction where it would be

24   inconsistent with the theory of defense.

25        In short, it would be highly unlikely,

1    given the only probable issue on appeal is the

2    sufficiency of the evidence.  The standard which is, I

3    recall, one must show -- the Seventh Circuit has said

4    that a sufficiency claim is one in which the defendant

5    faces an almost insurmountable burden on appeal.  Given

6    that that is the standard the defendant faces, it is

7    highly unlikely that this conviction will result in a

8    reversal on appeal.  Because of that, and because that

9    is the standard this Court must consider in deciding

10   whether or not to release the defendant on bond pending

11   appeal, the motion should be denied.

12        THE COURT:  Mr. Goodman, before you respond, I

13   do want to say that with respect to the statute 3143(b),

14   subsection (a), I regard it as shown by clear and

15   convincing evidence that he is not likely to flee.

16        MR. GOODMAN:  Thank you.

17        THE COURT:  And by clear and convincing

18   evidence that in his current lifestyle, not likely to

19   pose a danger to the safety of any other person or the

20   community.  So the issue is basically the meaning of the

21   appeal not being for the purposes of delay, which I

22   think is also shown.  But the other condition, which is

23   the one the prosecutor has argued against, is that I

24   ought not to find that the appeal raises a substantial

25   question of law or fact likely to result in an order for

1    a new trial -- which is the one that would apply here.

2        MR. GOODMAN:  As your Honor correctly noted,

3    the Seventh Circuit found only one of the issues

4    preserved for appeal.  It then made what I consider to

5    be -- it didn't consider the other two issues on the

6    merits.  It didn't perform any analysis.  It issued what

7    I considered to be somewhat gratuitous remarks saying --

8    don't get your hopes up -- which I suppose is reasonable

9    because most cases are affirmed on appeal.  I appreciate

10   those remarks, but I think when the Court does consider

11   the issues -- I just want to address the Crawford error.

12       The Seventh Circuit has, since Crawford,

13   decided at least three cases where it strictly applied

14   Crawford.  One of them I cited in my papers.  The other

15   two are --

16       THE COURT:  Let's stop for a second.

17       Leaving aside Crawford and Washington, and

18   leaving aside the issue of retroactivity, although it is

19   fairly clear to me that on direct appeal it will be

20   retroactive.

21       The point of view I took with respect to

22   that, before Crawford and Washington, is it is a problem

23   with that evidence under Ohio and Robertson, even the

24   more permissible rule.  Even in that respect you don't

25   have to persuade me that the issue you raised has

1    substantial merit.  What you have to respond to is what

2    you are responding to, which is the point of the

3    prosecutor that you can interpret the Court of Appeals'

4    opinion as throwing a fairly large bucket of cold water

5    on the chances of a new trial on appeal.

6          MR. GOODMAN:  I think that is correct.  I think

7    it was a one-sentence shot at our chances of prevailing

8    on that ground.  But again there is no analysis.  So I

9    think the Seventh Circuit is issuing a considered

10   opinion based on experience that you are not going to

11   win this appeal without actually having done the work.

12   I think if you look at the one case, United States

13   versus Silva, which is a 2004 case, and it is a

14   remarkably similar case.  It is an opinion by Judge

15   Easterbrook.

16               In that case the defendant was charged

17   with a drug conspiracy.  At trial, the Government agent

18   testified about conversations between the nontestifying

19   confidential informant and a supplier, wherein they

20   named the defendant.  In their conversation, they talk

21   about the defendant as the person who is going to make

22   the delivery.  The Government contended that this

23   evidence was admissible to show the actions taken by the

24   witness.  The exact same explanation the Government had

25   in this case.  The reason they put it in is to show why

1    the agents then attempted to set up Mr. Eberhardt.   The

2    District Court overruled the defense's objections.

3                THE COURT:   I am actually familiar with the

4    case.

5                MR. GOODMAN:   Then your Honor is familiar with

6    the fact that the Seventh Circuit rejected that

7    argument.

8                THE COURT:   Let me tell you what my view is.

9                "Likely to result" is a term of art in the

10   law.  We use "likelihood of success" in injunctive

11   cases.  It usually doesn't mean, shown by a

12   preponderance of the evidence that you are going to

13   succeed.  It is usually interpreted to mean that you

14   have got a demonstrably good chance.  I think that that

15   is true in this case because I read the opinion

16   differently than either of you do.  Perhaps because on

17   occasion I have sat on an appeal.

18               You have on appeal a decision by a

19   District Judge that a new trial was warranted for three

20   errors.  I was very clear in my opinion and the Court of

21   Appeals correctly took me at my word that one of them

22   alone would not do the trick.

23               The reason they reversed my finding is

24   because only one of the issues was properly before me.

25   The other two had failed because they were raised too

1    late in the process, and the process in which in the

2    criminal law is fairly rigid, the timing.

3              They also did that in a situation in which

4    the Government had not raised the preclusion of the

5    grounds before me.  When you are sitting on the Court of

6    Appeals and you have a case in which a ground not raised

7    below is cause for reversal -- particularly in a

8    criminal case where a new trial has been granted -- most

9    Judges believe that one ought to explain to the

10   litigants at least why it is that this decision

11   reversing the new trial on a mere technically -- it was

12   your classic mere technicality -- is not a patent

13   injustice.  One of the ways to point this out is to say,

14   it might well have not made a difference even if the

15   issues had been before you.  I think that is the point

16   they were making.

17             My view is, assuming all three issues are

18   properly preserved for appeal, it is still quite

19   conceivable that the Court of Appeals will disagree with

20   my judgment.  And it is their judgment that controls,

21   not mine.

22             But I do believe that within the meaning

23   of "likely" as expressed in this statute, there is in my

24   judgment a substantial question of law "likely", as I

25   define it, to result in an order for a new trial.

50

1          So the motion for bond pending appeal is

2     granted.

3          MR. GOODMAN:  Thank you.

4          THE COURT:  The Government, of course, is free

5     to raise this issue again with the Court of Appeals,

6     which may be in a better position than I am to tell us

7     exactly what it is they meant in their opinion.

8          I see no reason not to continue with the

9     same bond that exists, although if the Government wishes

10    to add additional conditions -- the Government is

11    indicating it does not wish to do so.

12         MR. BHACHU:  No, your Honor.

13         THE COURT:  Therefore, the motion for bond on

14    the appeal is granted and the same bond will continue.

15         Thank you.

16         MR. BHACHU:  Thank you, your Honor.

17         DEFENDANT EBERHARDT:  Thank you, your Honor.

18         MR. GOODMAN:  Just one other matter.  Mr.

19    Eberhardt has filled out a financial affidavit.  His

20    family, they have no more funds for counsel.  I would

21    ask the Court -- I am not asking for any fees for this

22    proceeding, but for the appeal.  I don't know what the

23    procedure is, actually.

24         THE COURT:  I believe what I do is I will

25    appoint you for purposes of filing the notice of appeal

51

1    and for applying to the Court of Appeals for

2    appointment.

3             MR. GOODMAN:  Thank you.

4             THE COURT:  Or at least that somebody be

5    appointed.  I am satisfied with the financial affidavit

6    which has just been handed up to me.

7             Thank you.

8             MR. GOODMAN:  Thank you.


             I certify that the foregoing is a correct
transcript of the original shorthand notes of
proceedings in the above-entitled matter.


_____        _____
Anthony W. Lisanti                          Date
Official Court Reporter

## VERIFICATION

I, Ivan Eberhardt, hereby declares, verifies and affirms under penalty of perjury that the facts stated in the foregoing Motion and the accompanying Memorandum of Law are true and correct to the best of my knowledge and belief.

Executed on June $\underline{5}$, 2008 pursuant to 28 U.S.C. §1746

IVAN EBERHARDT

08CV3394
JUDGE ZAGEL
MAGISTRATE JUDGE COX
    NF

EXHIBIT A
INDICTMENT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE LINDBERG

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 98 CR 936 |
| v. | ) | Violations: Title 21, |
| | ) | United States Code, |
| CHARLES BOLDEN and | ) | Sections 841(a)(1) and 846 |
| MARCUS E. DAVIS | ) | Superseding Indictment |

COUNT ONE

The SPECIAL JANUARY 1999-2 GRAND JURY charges:

1.     From in or about December 1997 and continuing until in or about December 1998, in the Northern District of Illinois, Eastern Division,

CHARLES BOLDEN and
MARCUS E. DAVIS,

defendants herein, conspired with each other, and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute over five kilograms of mixtures containing cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.     It was part of the conspiracy that defendant CHARLES BOLDEN obtained cocaine from his supplier, Ivan Eberhardt, for purposes of resale, delivery, and distribution to others.

3.     It was further part of the conspiracy that, in or about November 1998, defendant MARCUS E. DAVIS arranged for the sale of more than 500 grams of cocaine from BOLDEN to an individual (referred to herein as "Individual A") whom DAVIS had introduced to BOLDEN.

4.   It was further part of the conspiracy that, in or about November 1998, BOLDEN obtained over 500 grams of cocaine from Eberhardt.   BOLDEN subsequently distributed the cocaine to Individual A at DAVIS's residence in Blue Island, Illinois.

5.   It was further part of the conspiracy that, in or about December 1998, DAVIS arranged for the sale of approximately two kilograms of cocaine from BOLDEN to Individual A.

6.   It was further part of the conspiracy that, in or about December 1998, BOLDEN obtained approximately two kilograms of cocaine from Eberhardt on consignment.   BOLDEN agreed to pay Eberhardt $40,000 from the proceeds of the sale of the cocaine.

7.   It was further part of the conspiracy that, on or about December 16, 1998, BOLDEN distributed the two kilograms of cocaine to Individual A at DAVIS's residence.

8.   It was further part of the conspiracy that defendants BOLDEN and DAVIS would and did misrepresent, conceal, and hide, and cause to be misrepresented, concealed, and hidden, the purposes and acts done in furtherance of the conspiracy, and used means to avoid detection and apprehension by law enforcement authorities;

All in violation of Title 21, United States Code, Section 846.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE ZAGEL

UNITED STATES OF AMERICA            )
                                    )              MAGISTRATE JUDGE LEVIN
              v.                    )
                                    )      No. 98 CR 946
IVAN EBERHARDT                      )      Violations: Title 21,
                                    )      United States Code,
                                    )      Sections 841(a)(1) & 846
                                    )

MAR 17 1999

COUNT ONE

The SPECIAL JANUARY 1999-2 GRAND JURY charges:

Beginning in or about December 1997 and continuing until in or about December 1998, in the Northern District of Illinois, Eastern Division, and elsewhere,

IVAN EBERHARDT,

defendant herein, conspired with Charles Bolden and others known and unknown to the Grand Jury to knowingly and intentionally possess with intent to distribute and distribute kilogram quantities of mixtures containing cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.    It was part of the conspiracy that defendant EBERHARDT sold kilogram quantities of cocaine to Charles Bolden so Bolden could resell the cocaine to others.

3.    It was further part of the conspiracy that on or about December 16, 1998, defendant EBERHARDT distributed at least two kilograms of cocaine to Charles Bolden for resale.

4.    It was further a part of the conspiracy that on or about December 16, 1998, Charles Bolden sold the cocaine received from



defendant EBERHARDT to an individual who was cooperating with the Drug Enforcement Administration.

5.    It was further part of the conspiracy  that defendant EBERHARDT would and did hide, misrepresent, conceal, and cause to be misrepresented, concealed, and hidden, the purposes of acts done in furtherance of the conspiracy, and would and did use means to avoid detection and apprehension by law enforcement authorities;

In violation of Title 21, United States Code, Section 846.

2

## COUNT TWO

On or about December 16, 1998, in the Northern District of Illinois, Eastern Division,

IVAN EBERHARDT,

defendant herein, distributed approximately two kilograms of mixtures containing cocaine, a Schedule II Controlled Substance;

In violation of Title 21, United States Code, 841(a)(1).

A TRUE BILL:

_William G. Peterson_
FOREPERSON

ACTING _Sheila Finnegan_
UNITED STATES ATTORNEY

3

EXHIBIT B
JUDGMENT AND COMMITMENT

(Rev. 03/05)

# United States District Court
## Northern District of Illinois

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Case Number: 98-CR-946-1** |
| | ) | **Judge: James B. Zagel** |
| IVAN EBERHARDT | ) | |

Leonard Goodman, Defendant's Attorney
Amarjeet Bhachu, AUSA

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

**THERE WAS A:**

jury verdict of guilty as to count(s) 1 of the indictment.
**THERE WAS A:**

judgment of acquittal as to count(s) 2 of the indictment. The defendant is acquitted and discharged as to this/these counts.

## THE DEFENDANT IS CONVICTED OF THE OFFENSES(S) OF:

| Title & Section | Description of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21:841(a)(1) and 846 | Conspiracy to possess with intent to distribute cocaine | 12-16-1998 | 1 |

The defendant is sentenced as provided in the following pages of this judgment.

# IMPRISONMENT

## IT IS THE JUDGMENT OF THIS COURT THAT:

the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of **135 months**.

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for the periods specified for each count of conviction.

The defendant shall report immediately to the probation office in the district in which the defendant is to be supervised, but no later than seventy-two hours after sentencing.  In addition, see the attached page(s) defining the mandatory, standard and discretionary conditions of probation that apply in this case.

# MANDATORY CONDITIONS OF SUPERVISED RELEASE
## (As set forth in 18 U.S.C. § 3583 and U.S.S.G. § 5D1.3)

1)      For any offense, the defendant shall not commit another federal, state or local crime;

2)      for any offense, the defendant shall not unlawfully possess a controlled substance;

3)      for offenses committed on or after September 13, 1994, the defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within fifteen days of release from imprisonment and at least two periodic drug tests thereafter for use of a controlled substance as determined by the court:

         At least two within the first sixty days.

4)      for a domestic violence crime committed on or after September 13, 1994, as defined in 18 U.S.C. § 3561(b) by a defendant convicted of such an offense for the first time, the defendant shall attend a rehabilitation program in accordance with 18 U.S.C. § 3583(d);

5)      for a defendant classified as a sex offender pursuant to 18 U.S.C. § 4042(c)(4), the defendant shall comply with the reporting and registration requirements set forth in 18 U.S.C. § 3583(d);

6)      the defendant shall cooperate in the collection of a DNA sample from the defendant if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 and the Justice for All Act of 2004; and

7)      The defendant shall pay any balance on the special assessment, restitution and/or fine imposed against the defendant.

# STANDARD CONDITIONS OF SUPERVISED RELEASE

1)      For any felony or other offense, the defendant shall not possess a firearm, ammunition, or destructive device as defined in 18 U.S.C. § 921;

2)      the defendant shall not leave the judicial district without the permission of the court or probation officer (travel outside the continental United States requires court authorization);

3)      the defendant shall report to the probation officer as directed by the court or the probation officer and shall submit a truthful and complete written report within the first five days of each month;

4)      the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

5)      the defendant shall provide to the probation officer access to any requested financial information including, but not limited to, tax returns, bank statements, credit card statements, credit applications, etc.;

6)      the defendant shall support his or her dependents and meet other family responsibilities;

7)      the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

8)      the defendant shall notify the probation officer ten (10) days prior to any change in residence or employment;

9)      the defendant shall refrain from excessive use of alcohol;

10)      the defendant shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician, and shall submit to periodic urinalysis tests as requested by the probation officer to determine the use of any controlled substance;

11)      the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

**IVAN EBERHARDT**
**98 CR 946**

12)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

13)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

14)    the defendant shall notify the probation officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;

15)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

16)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

17)    if this judgment imposes a special assessment, restitution or a fine, it shall be a condition of probation or supervised release that the defendant pay any such special assessment, restitution or fine in accordance with the court's order set forth in the Criminal Monetary Penalties sheet of this judgment.

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE

The defendant shall also comply with the following additional conditions of supervised release:

The defendant shall participate in a drug aftercare program approved by the probation officer, which may include residential program for treatment of a narcotic addiction or drug or alcohol dependency and/or testing for detection of substance use or abuse.

IVAN EBERHARDT
98 CR 946

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the "Schedule of Payments." Unless waived, the defendant shall pay interest on any restitution and/or fine of more than $2,500, unless the restitution and/or fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). The payment options may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

| Total Assessment(s) | Total Fine | Restitution | Mandatory Costs of Prosecution |
|---|---|---|---|
| $100.00 | Fine Waived | $ | $ |

The defendant shall notify the United States Attorney's Office having jurisdiction over the defendant within thirty days of any change of name, residence or mailing address until all special assessments, restitution, fines, and costs imposed by this judgment are fully paid.

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons as notified by the United States Marshal.  Defendant is bond pending appeal.

## RETURN OF SERVICE

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____.

By:_____
(Signature)

Name (Print)_____

Title (Print)_____

Date of Imposition of Judgment/Sentencing: April 22, 2005

JAMES B. ZAGEL
UNITED STATES DISTRICT JUDGE

Dated at Chicago, Illinois this 25th day of April, 2005

**STATEMENT OF REASONS**
**[NOT FOR PUBLIC DISCLOSURE]**

Defendant's Last Known Address:          1029 Patricia Lane
                                         Crete, IL 60417


DOB:            03-21-1969
USM #:          03796-424
SSN:            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

THE COURT ADOPTS THE PRESENTENCE REPORT AND GUIDELINE APPLICATIONS BUT WITH THESE CHANGES:

**Chapter Two of the U.S.S.G. Manual** determinations by court (including changes to base offense level or specific offense characteristics): Reduction in base offense level on court determination of lesser distribution amount.

**SPECIFIC SENTENCE IS IMPOSED FOR THESE REASONS**

The guideline range is reasonable and while the offender is typical, the offense is milder than the typical offense so the sentence is lower that the middle of the Guideline range.

**GUIDELINE RANGE DETERMINED BY THE COURT (BEFORE DEPARTURES):**

Total Offense Level: 32

Criminal History Category: II

Imprisonment Range: 135 - 168 months

Supervised Release Range: 3 - 5 yeas

Fine Range: $17,500  - $4,000,000

Fine waived or below the guideline range because of inability to pay.

**THE SENTENCE IS WITHIN A GUIDELINE RANGE, THAT RANGE EXCEEDS 24 MONTHS, AND THE SPECIFIC SENTENCE IS IMPOSED FOR THESE REASONS:**


JAMES B. ZAGEL
UNITED STATES DISTRICT JUDGE

Dated at Chicago, Illinois this 25th  day of April, 2005

EXHIBIT C

SENTENCING TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
            vs.              )  No. 98 CR 946
                             )
IVAN EBERHART,               )  Chicago, Illinois
                             )  Friday, April 22, 2005
            Defendant.       )  10:30 o'clock a.m.
                             )  Room 2503

REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL

APPEARANCES:

For the Government:      MR. PATRICK J. FITZGERALD
                         UNITED STATES ATTORNEY
                         219 South Dearborn Street
                         Suite 500
                         Chicago, Illinois  60604
                         BY:  MR. AMARJEET BHACHU


For the Defendant:       MR. LEONARD GOODMAN
                         53 West Jackson
                         Suite 1460
                         Chicago, Illinois  60604


Also Present:            US PROBATION
                         55 East Monroe Street
                         Suite 1500
                         Chicago, Illinois  60603
                         BY:  MR. TODD McKECHNIE


Court Reporter:          MR. ANTHONY W. LISANTI
                         United States Courthouse
                         219 South Dearborn Street
                         Chicago, Illinois 60604
                         (312) 939-2092

1            THE CLERK:  98 CR 946.  The United States
2     versus Eberhardt.
3            MR. BHACHU:  Good morning, your Honor.
4     Amarjeet Bhachu on behalf of the United States.  The
5     last name is spelled BHACHU.
6            MR. GOODMAN:  Good morning, your Honor.
7     Leonard Goodman on behalf of Ivan Eberhardt who is here
8     in Court.
9            THE COURT:  I see him.
10           MR. McKECHNIE:  Todd McKechnie here on behalf
11    of the Probation Office.
12           THE COURT:  I have in front of me the
13    presentence investigation report and an addendum to that
14    report prepared at some time in the past.  I have a
15    supplemental sentencing memorandum and the motion for
16    bond pending appeal.
17                Leaving aside letters from individuals, is
18    there anything else I should have?
19           MR. BHACHU:  I don't believe so, your Honor.
20           MR. GOODMAN:  No, Judge.
21           THE COURT:  Mr. Goodman, you and your client
22    have both obviously read the presentence report and the
23    addendum?
24           MR. GOODMAN:  Yes.
25           THE COURT:  Other than what has been recited in

1    the papers there attached, and the supplemental

2    sentencing memorandum, are there any other corrections

3    or adjustments you want to make with respect to the

4    report?

5              MR. GOODMAN:  I don't believe so.

6              THE COURT:  If that is the case, we will begin

7    with the Government.

8              MR. BHACHU:  Your Honor, just in perspective.

9    The factors in aggravation and mitigation in this case

10   -- this was, as your Honor probably recalls, a cocaine

11   conspiracy case.  The defendant was apprehended -- well,

12   it was through the course of the investigation where the

13   police first began with a surveillance operation of a

14   house.  They found an individual who delivered some

15   cocaine to that location.  They subsequently stopped

16   that individual after he had delivered two kilograms of

17   cocaine to that house.  That individual, Charles Bolden,

18   agreed to cooperate with the Government.

19              Charles Bolden made a number of recorded

20   phone calls, to source of supply "E", and subsequently

21   arranged for meeting with Ivan Eberhardt.  At that

22   meeting, Mr. Bolden got into a car with Mr. Eberhardt

23   and they had a conversation after Mr. Bolden had entered

24   the car.  It was very clear from that conversation that

25   Eberhardt was very interested to know what the DEA had

1    presence of a scale and a high-speed money counter and,

2    I believe, "Blank", if I remember correctly.

3              Mr. Eberhardt decided to go to trial.  At

4    trial he was convicted of conspiring to distribute more

5    than five kilograms of cocaine.

6              In terms of aggravation, Mr. Eberhardt in

7    addition to that offense admitted that he actually

8    transacted quantities of twenty to forty kilos of

9    cocaine a month.  Mr. Bolden, in a separate statement,

10   indicated that he got between six and seven kilograms

11   from Mr. Eberhardt on a monthly basis.  Clearly the

12   defendant was involved in moving a substantial amount of

13   cocaine during the time he was involved in this

14   conspiracy.

15             With respect to his prior record, Mr.

16   Eberhardt doesn't have a clean record.  This isn't a

17   case where we have an individual that has a spotless

18   record, that was perhaps led astray or made a wrongful

19   decision.  Not only did he admit to us that he had been

20   transacting cocaine for at least a month prior, but his

21   record indicates that he has been previously convicted

22   of driving under the influence.  He also has a UUW

23   conviction.  He has multiple arrests, some of them

24   involving controlled substances including cocaine.  He

25   has been arrested several times for disorderly conduct.

1    There is also a battery arrest as well.

2                    In connection with that, the presentence

3    report indicates that Mr. Eberhardt has, on occasion,

4    engaged in battery of women.  His former wife indicated

5    in her statement to the Probation Officer that abuse by

6    the defendant started the day they were married, and

7    that she had frequently had her eyes blackened by the

8    defendant.

9                    There is another report or another

10   indication from Ms. Wilson, who at some point, I

11   believe, had a relationship with the defendant, where

12   she actually filed a complaint against the defendant.

13   The police arrived, and her complaint indicated that she

14   had suffered physical abuse.  That the defendant had

15   punched her in the nose and that the defendant had also

16   bitten her on the head as well.  So this is not a

17   defendant who made one poor step or has demonstrated

18   that he has strong moral character.

19                    He also indicated in the presentence

20   report that at a prior period of time he drank

21   excessively.  All of these things indicate that the

22   defendant does not have good moral character.  He is a

23   threat to the community in general.  He has an extensive

24   criminal background.

25                    Moreover, the defendant has not accepted

1    responsibility for this offense.  The latest papers

2    filed by counsel persist in the notion that this case

3    was concocted against the defendant despite the fact

4    that we have these taped conversations where the

5    defendant quite clearly is talking about Mr. Bolden's

6    involvement with the DEA, what was going on with the

7    DEA.

8         At one point Mr. Bolden during the course

9    of the conversation says to Mr. Eberhardt -- you know,

10   you must think that I am tapped or that I have got a

11   wire.  The response that Mr. Eberhardt gives quite

12   clearly demonstrates that he understood what was going

13   on and what he was doing.  He was not an innocent party

14   in this case at all.

15        There is some suggestion in the letters

16   that I have seen today, and some submissions by counsel

17   for the defendant, that the defendant has a number of

18   children.  He is now employed; however, I would note for

19   the Court that under 5H1.5 and .6, employment records

20   and family obligations generally are not grounds for a

21   departure.  Moreover, to the extent that the defendant

22   has been able to conform his conduct to the law since

23   the time he was convicted, I would submit that any

24   rehabilitative efforts that he was engaged in since he

25   was convicted should not be considered by the Court.

1          Now as your Honor is well aware, the
2    Guidelines are no longer mandatory.  They are advisory.
3    The Government's position, as your Honor is also aware,
4    is that any sentence handed out by this Court should be
5    consistent with and within the Guideline range.  The
6    reason for that is that the Guidelines were enacted in
7    order to ensure that there were not disparate sentences
8    handed out to defendants, depending on which Court they
9    appeared before and what date they were sentenced.
10          The Congress, when they actually passed
11    the sentencing Guidelines, indicated that the sentencing
12    scheme that existed prior to the initiation of the
13    Guidelines was unjust, because it either resulted in a
14    sentence that was too high with respect to any
15    defendant, when compared to a similarly situated
16    defendant, or it resulted in a sentence that was too
17    low, thus being unfair to the public.  Congress went so
18    far as to call the system of indeterminate sentencing
19    shameful..
20          It would be the Government's position that
21    a deviation from the Guidelines would be unreasonable,
22    and also that it would be unfair to the public where
23    other defendants, similarly situated to this defendant,
24    must, in fact, face a sentence within the Guideline
25    range.  There are no extenuating circumstances to

1    justify a departure from the Guideline range in this

2    case.

3              In terms of factors in mitigation, your

4    Honor, I am always ready to admit when such exists.  I

5    am hard-pressed to find any in this case.  I do concede

6    -- I have talked to counsel before today -- that the

7    defendant, since the time of his conviction, has not

8    fled.  He has appeared at proceedings before this Court.

9    I notice that he did appear for his appellate argument

10    as well.  I guess it can be said that he has not

11    subsequently been involved in any criminal conduct.  But

12    beyond that there isn't much in the way of mitigation in

13    this case that I could see.

14              For that reason, we recommend that a

15    sentence within the advisory Guideline range be imposed

16    upon the defendant.  Even considering the Guideline

17    range, I would note that the Probation Report indicates

18    that the Guideline range is a level thirty-six.  In this

19    case it is category two.  That is a conservative

20    estimate.  Level thirty-six actually could be a level

21    thirty-eight, were we to take the defendant's statements

22    at face value that he was actually transacting in

23    quantities of cocaine of twenty to forty kilograms at

24    month.

25              Mr. Meza, I defer to his judgment, though

Wilson - direct                    10

1   he is no longer with the office, indicated that the

2   conservative approach in this case would be to look at

3   the evidence and interpret that to result in a Guideline

4   range of thirty-six.  So a base offense level of thirty-

5   six for this offense.  That being said, I think a

6   sentence within that range would be appropriate.

7          THE COURT:  Mr. Goodman.

8          MR. GOODMAN:  I do have some comments that I

9   would like to make in response to Mr. Bhachu.  But I

10  also have two witnesses who wanted to testify.  Would

11  this be a good time to hear from them?

12         THE COURT:  Sure.

13         MR. GOODMAN:  I think the first witness would

14  be Lemanda Wilson.

15         THE COURT:  Can we do this from the lectern?

16         MR. GOODMAN:  Yes.  That's fine.

17         THE COURT:  Mr. Walker.

18

19         L E M A N D A   W I L S O N,

20  having been duly sworn, called as a witness on behalf of

21  the defendant, testified as follows:

22

23                      EXAMINATION

24  BY MR. GOODMAN:

25  Q.   Please state your name?

Wilson – direct                    11

1    A.   Lemanda Wilson.

2    Q.   How do you know Ivan Eberhardt?  And for how long

3    have you known him?

4    A.   I have been knowing Ivan Eberhardt for eighteen

5    years.  We have three children together.

6    Q.   After you had the children, you were separated for

7    a period of time, is that right?

8    A.   Correct.

9    Q.   Now are you back together?

10   A.   Correct.

11   Q.   Do you have plans to marry?

12   A.   Correct.

13   Q.   Tell me about the three children.  What are their

14   names and ages?

15   A.   Markesa Eberhardt, age fourteen, Marshana

16   Eberhardt, age thirteen, and Ivan Eberhardt, age twelve.

17   Q.   Tell the Judge about Ivan's relationship with his

18   children.  Does he have a close relationship -- how much

19   time does he spend with them?  Does he provide financial

20   support for them?

21   A.   Yes.  Ivan has a relationship with our children on

22   a daily basis.  He has provided for our children since

23   birth.  Financially, mentally.  He just helps.  He has

24   always been in our children's lives.

25   Q.   Would it be a substantial hardship on the children

Wilson - direct                                    12

1    and on yourself if Ivan were incarcerated for a long

2    period of time?

3    A.   Yes, it would.  At this time Ivan is helping me

4    tremendously with the children.  Because now they are

5    getting older.  They are changing.  I am changing.  He

6    is helping me around the house.  Right now financially

7    he is helping me as they are getting older.  We have a

8    bigger responsibility now; in which I alone can't do it.

9    Right now we are splitting everything down the middle.

10   He is doing as much as he can.

11   Q.   Do you work?

12   A.   Yes, I do work.  But my income alone does not

13   provide for me and the three children.

14   Q.   What kind of work do you do?  Is it full-time work?

15   A.   Yes, it is full-time work.  I am an administrative

16   assistant with the City of Chicago, Consumer Services.

17   Q.   How would you manage with Ivan in prison?

18   A.   Actually, I would have to get a second job as I did

19   before.  His family was a big help to me.  My mom was a

20   great help to me also while he was gone.

21   Q.   Mr. Bhachu mentioned some abuse.  Is Ivan abusive?

22   Has he been abusive to you in the last five years?

23   A.   No, sir.

24   Q.   Is there anything else you want to tell the Judge

25   about Ivan's character or his relationship with you or

Wilson - direct                                    13

1    with his children?

2    A.   Again, your Honor, we are a family.  I feel that

3    our children need to stay with both parents and a

4    family.  Because he is very close to my children, not

5    only my three, he is also close to his children that he

6    had in former relationships.  Although what the

7    gentleman stated was true, in time things change, people

8    change.  We have a healing process.  We just need him in

9    our lives right now.

10   Q.   I meant to ask you -- Ivan has two other children,

11   is that correct?

12   A.   Correct.

13   Q.   Is he involved with their lives as well?

14   A.   Yes.  The oldest one, not only is he involved in

15   their lives, I am, too, with the rest of my children.

16   They have a great relationship.  She has a relationship

17   with my immediate family, my mom, my aunt -- just very

18   close to me.  And he also has a younger child which he

19   supports and has always supported, which he has by his

20   wife.  I feel he is doing a great job.

21             MR. GOODMAN:  Thank you.

22                  Nothing further.

23        THE WITNESS:  Thank you.

24             MR. BHACHU:  No questions, your Honor.

25             THE COURT:  Your next witness.

1

2              R E G I N A   R O G E R S   R A Y M O N D,

3     having been duly sworn, called as a witness on behalf of

4     the defendant, testified as follows:

5

6                                EXAMINATION

7     BY MR. GOODMAN:

8     Q.   Please state your name for the record?

9     A.   Regina Rodgers Raymond.

10    Q.   How do you know Ivan Eberhardt?

11    A.   Ivan is a contractor for a building that I manage.

12    I have been there for six years.  We occupy senior and

13    disabled residences.

14    Q.   How long has he worked for you?

15    A.   I met Ivan in 2003.

16    Q.   Shortly after he was put back on bond?

17    A.   Perhaps.  Correct.

18    Q.   Can you tell the Judge what Ivan has been doing

19    when he is not at home, for the last two years?

20    A.   The building that I manage occupies one hundred and

21    sixteen units.  We monthly have units that need to be

22    recycled, as far as decorating and painting.  He

23    installs cabinets, floors, baseboards, paints --

24    whatever the unit needs to bring it up to the Federal

25    Code.

Griffin - direct                          15

1    Q.    How many hours a week does he work for you?

2    A.    He works eight hours a day.

3    Q.    Have you found him to be trustworthy - reliable -

4    honest?

5    A.    The reason why I say "yes" is because we have units

6    that are occupied with senior disabled.  They are fully

7    occupied.  We have one hundred percent occupancy.  A lot

8    of the units that he has to go into are occupied with

9    the tenants' personal belongings.

10   Q.    Have you had any incidents?

11   A.    Never.

12            MR. GOODMAN:  Nothing further.

13            MR. BHACHU:  No questions, your Honor.

14            THE COURT:  Thank you.

15            MR. GOODMAN:  I don't believe we have anybody

16   else, unless there is anyone else that needs to say

17   anything --

18            THE COURT:  Do you have additions to your

19   statement, Mr. Goodman?  I see that you have one person.

20

21                  M A R Y   G R I F F I N,

22   having been duly sworn, called as a witness on behalf of

23   the defendant, testified as follows:

24

25                         EXAMINATION

Griffin - direct                              16

1    BY THE WITNESS:

2    A.    I am Mary Griffin.  I am Ivan's aunt.  I have known

3    Ivan all of his life.

4          I want to say that Ivan is an exemplary young

5    man.  He is an inspiration to the entire family.  As he

6    has gone through this trial, for the last eight years,

7    we have looked to him for inspiration for us.  He has

8    never lost his spirit and hope.  He has never lost his

9    spirit of love, in raising a family.

10          Ivan is a hard worker.  He is a faithful

11   believer.  He is in church religiously, Sundays and

12   throughout the week.  He serves in his church.  He

13   serves in his community.  He serves the family.  He is a

14   wonderful father.  He is an extraordinary friend and he

15   is a nephew that I feel has been a blessing to me and to

16   the entire family.

17          I plead with your Honor to take into

18   consideration Ivan's willingness and his demonstration

19   to change whatever behaviors there may have been in the

20   past and to also consider some of the injustices, from

21   my perspective, the unfairness of the proceedings that

22   have been against him thus far.

23          Ivan, he deserves a chance to be the young

24   man that I know he can be.  And I thank you.

25          MR. GOODMAN:  Thank you.

Harris - direct                          17

1          Excuse me, Judge.   There is one more.

2

3          S T E V E N     H A R R I S,

4    having been duly sworn, called as a witness on behalf of

5    the defendant, testified as follows:

6

7                        EXAMINATION

8    BY THE WITNESS:

9    A.   My name is Steven Harris.   I am representing the

10   Brothers, from the Apostolic House of Prayer, the

11   Brotherhood.   I am the secretary for the Brotherhood,

12   but we are making transitions right now.   I don't know

13   what position I am going to be in next.

14          I'm coming up on behalf, to speak on Ivan

15   Eberhardt for the Brothers.   I have known him about five

16   - six years.   You know, to me, I never noticed anything

17   unusual about the Brother, no threats.   He was always a

18   gentleman to me and the Brothers, always helping.   He is

19   involved in the church.   We were just with each

20   Wednesday at Bible study.   You know, his kid was there

21   Sunday in church.

22          I am kind of -- I ain't going to talk about the

23   case.   I don't know what is going on with that.   You

24   know, to me, I think it is a mistake, something is not

25   right in it.   But I just see the Brother, you know, a

Harris - direct                    18

1    family man, a strong support to his family.  He set a

2    good example around the church because other brothers

3    are looking at him, because you have got all the kids

4    looking for strong me today.  Honestly speaking, you

5    don't have too many strong black men.

6           I just don't represent anybody.  I have to see

7    something in anybody for me to stand and speak on behalf

8    of anybody or support somebody in a situation like this.

9    The reason why I am here to speak on behalf of him is

10   because I see a lot in the Brother.  I never felt like

11   he was a threat to anyone.  I never felt like he was

12   involved with anything that is unusual.

13          In the times that we have been together, you

14   know, he drove me home before.  We sat outside of the

15   church.  Me and his mother was the editor of a

16   newsletter.  He would come by sometimes.  He would put

17   his input.  He used to put information inside the church

18   newsletter, different articles also.  At times he would

19   sit down with us and help us with the newsletter.

20          In that period of time I just noticed -- I

21   thought that when this was going on it was kind of a

22   surprise to me.  in the time that I had known him, he

23   was like to me -- to me I look at him as a powerful

24   young Brother.  His kids love him very much, his wife,

25   his girl, you know, they hang very tightly in church.

Harris - direct                    19

1        Like I say, he is a good example, a good role
2    model for us.  We all stood up on behalf of him Sunday.
3    It was about fifty Brothers around with him, praying
4    with him, you know.  We even signed a petition on behalf
5    of him, all of the Brothers.  A lot of Brothers couldn't
6    make it.  I just told the Brothers, honestly speaking,
7    man, I just believe, I think me personally, I think it
8    would be a mistake for a Brother like this man to be
9    separated from his family and his kids.  Because we need
10   our fathers out there.  You know, the kids need their
11   fathers.  There is so much going on in our communities,
12   with the drugs and alcohol and things that are not going
13   right.
14       I look at his kids, you know, and his kids
15   cling onto him.  They hold onto him for guidance and
16   help.  A lot of times -- we got a lot of strong mothers
17   out here, but sometimes they can't do it all on their
18   own.
19       I represent the Brothers -- there is a lot more
20   I could say.  I am just representing him because I love
21   the Brother.  I am speaking on behalf of other Brothers.
22   I am standing by his side, knowing in my heart that
23   something about this is not right.  The Brother ain't
24   been making no mistakes, he just said in the past few
25   years, or whatever.  Everybody makes mistakes.  We all

I. Eberhardt - direct                          20

1    got skeletons in the closet somewhere.  But when we walk
2    openly, and not commit anything or do anything wrong,
3    then you are proving yourself.
4         Like I said, I think it would be a disaster to
5    separate a Brother from his family and his children.
6    Like I said, there is a lot more I can say but honestly,
7    I just wish we all just really honestly think about this
8    decision.  This is not just dealing with one life, but
9    it is dealing with many lives.
10        Like I said, I think that he is not just a man
11   out here doing things that is not right -- that is
12   wrong.  He is not a threat to the community.  Like I
13   said, I honestly wish that we make an honest decision
14   and really think about this.  Like I said, I think, from
15   what I know about it, I think it will be a mistake.  I
16   still believe in my heart there is omethign that is not
17   right.  Because to me he has proven himself as a man,
18   and not just a man but a man of God, too, and as a
19   powerful figure in church as well as with his kids and
20   as a friend.
21        That is all I have to say.  Thank you.
22        MR. GOODMAN:  Thank you.
23        THE COURT:  Thank you.
24        MR. GOODMAN:  The defendant's brother wants to
25   say a few words.

```
 1
 2              I R W I N   E B E R H A R D T,
 3    having been duly sworn, called as a witness on behalf of
 4    the defendant, testified as follows:
 5
 6                          EXAMINATION
 7    BY THE WITNESS:
 8    A.   My name is Irwin Eberhardt.  I am Ivan's older
 9    brother.
10             Ivan has always been a good friend to me and he
11    has been a role model for my children as well.  I have
12    two children who are twelve and thirteen.  They look up
13    to their uncle and they love their uncle.
14             As was said before, Ivan means a lot to many
15    people, especially to myself and my family, obviously.
16    I plead with the Court to consider that.  I believe the
17    purpose of the law is to be corrective, per se, and I
18    think he has shown over this period that he spent with
19    the punitive times, he has shown that he has been
20    corrective and he is a good man and capable of doing
21    good things with good people.  It would be devastating
22    to the community and to myself personally, my family and
23    my children if we were without him.
24             Thank you, your Honor.
25             THE COURT:  Thank you.
```

1              Any final remarks, Mr. Goodman?

2         MR. GOODMAN:  Yes, Judge.

3              I would like to speak to two issues.  One

4    is the quantity issue and then it is the mitigation

5    issue.

6              First, it is our position, Judge, that you

7    are not bound by the jury's finding of five kilos; for

8    two reasons.  One, it is my understanding that the jury

9    -- you may correct me if I am wrong -- the reason that

10   the jury makes a quantity finding is to determine

11   maximum sentences for Apprendi.  They are not binding on

12   the Court with respect to mandatory minimums.  That is

13   my understanding.  I haven't seen the case law that

14   speaks directly to that.

15             Secondly, I think that in this case I

16   would ask the Court to consider the evidence --

17   certainly this Court has the power to set aside a jury

18   finding not supported by competent evidence.  I think

19   that this is such a case.

20             I just want to briefly go through what was

21   the evidence that supports a finding that Ivan Eberhardt

22   is a multi-kilo drug dealer.  The first piece of

23   evidence that you heard at trial was hearsay from

24   Charles Bolden.  There is more hearsay that has been

25   presented at sentencing about what Bolden said.  I would

1    remind the Court that Mr. Bolden gave five different
2    stories to the Government.  He was deemed so unreliable
3    that Mr. Meza made a strategic decision that he could
4    not use him at trial and instead went to trial with no
5    witnesses to identify Ivan as a drug dealer.  That is a
6    pretty strong statement from the Government that this
7    witness is not reliable.
8            I would urge the Court, if the Court is at
9    all moved to consider Bolden's statements, take a look
10   at the various versions of his story.  They are all in
11   the exhibits in the motion for a new trial.  There is
12   five different statements that he gave and each one
13   changes dramatically.  In fact, in some of these
14   statements the agent that is taking the statement writes
15   -- the witness admits that he lied before and witness
16   changes his story.  It is very unusual to see comments
17   like that in a statement taken by the DEA.
18           The second piece of evidence that you
19   heard a trial was the tapes.  I will remind the Court
20   that these tapes were admitted -- they were tapes
21   between Ivan and a cooperating witness -- they were
22   admitted basically like a confession.  The cooperating
23   witness was trying to get Ivan to say things that would
24   incriminate himself.  You will recall that there is
25   nothing on those tapes where Ivan admitted selling

1    kilograms of cocaine.  The discussions are about Charles
2    Bolden's encounter with the DEA which Charles Bolden was
3    telling Ivan about.  There is nothing on those tapes.
4    In fact, the tapes are so worthless that the Government,
5    at trial, argued to the jury that the reason Ivan never
6    talks about selling kilogram quantities of drugs on the
7    tape is because he wanted a face-to-face meeting.  Your
8    Honor will recall that they pointed to a comment to put
9    words in the lips of Ivan Eberhardt that he never said.
10   It was established later, in fact, he never made that
11   request for a face-to-face meeting.  So the tapes are
12   worthless with respect to evidence of quantity.
13          That leaves only Ivan's statement, his
14   post-arrest statement to the DEA.  Just very briefly,
15   Judge, I would like to refresh the Court's memory about
16   those statements.  This was after Ivan was arrested.
17   This was shortly before Christmas in 1998.  He initially
18   denied being involved with drugs.  The agents explained
19   to him that his only hope of being released was to
20   convince them that he would be useful to them on the
21   outside and that he could, in fact, help them get
22   another drug dealer.
23          When he refused to cooperate, he was
24   locked in a holding cell.  Eventually he agreed to talk
25   about a person that he knew who was a drug supplier

1  named "Tommy".  He drove around with the agents and he
2  pointed to a house that he said was the house where
3  Tommy lived and delivered drugs.  They then let Ivan go
4  home and get a phone number to contact Tommy.  He came
5  back the next day with this phone number, made a series
6  of phone calls.  The agents asked him to try to arrange
7  a transaction.  He was unable to do so.  The cooperation
8  fell apart.
9          After all this, and it took three days,
10  after all this the agents could produce no notes, no
11  record of any statement that he made during those three
12  days and filed a report four months later that he made
13  all of these admissions.
14          In addition, Judge, the circumstances
15  under which the post-arrest statements were made do not
16  suggest reliability.  This is not a baring of the soul
17  confession.  This is a witness that has been scared when
18  they are saying -- your only chance of going home is to
19  help us get somebody else.  That is not a situation that
20  would give comfort and reliability in sentencing
21  somebody to a long period of time.
22          Secondly, the Government has conceded at
23  trial that it could not corroborate a single statement
24  in his post-arrest statement.  It could not identify
25  Tommy.  It could not even prove that there was such a

1　person as Tommy.  Tommy's phone number, that Ivan used

2　to contact him, was actually registered to a person

3　named "Juan Martinez".  Ivan's own phone records showed

4　no prior contacts with this person that is supposedly

5　his regular supplier.

6　　　　　　　　What about the defendant's other

7　suppliers?  In the statements apparently he said he had

8　three suppliers.  He had three customers.  One of them

9　was Bolden.  The Government was never able to

10　corroborate that he had any customers.

11　　　　　　　　There is no evidence that the defendant

12　ever possessed any of the trappings of a drug dealer.

13　He never was found with drugs, scales, baggies, cutting

14　agents, weapons, fancy cars, jewelry -- in fact, the

15　Probation Officer determined that he has a negative net

16　worth of about $18,900.

17　　　　　　　　The Probation Officer mentions two items

18　of corroboration, which are, in fact, entirely innocent

19　corroboration.  They mentioned the phone records showing

20　contacts between Ivan and Charles Bolden.  But your

21　Honor will recall that there was undisputed testimony

22　that the two of them had a relationship, a social and a

23　business relationship.

24　　　　　　　　Judge, if Ivan were a murder suspect and

25　he was told that he was going to get the death penalty

1    unless he could confess to other murders and he
2    confessed -- he said I committed sixteen murders -- no
3    one would suggest that that was a reliable statement
4    unless it can be corroborated in some way.  But for some
5    reason in drug cases they throw these numbers out there
6    and the Government asks the Court to believe them and
7    sends somebody away for ten years.  I think it is not
8    going too far out on a limb for the Court to say, the
9    Government should bring you some solid reliable evidence
10   that this man was a multi-kilogram drug dealer.
11            Just a couple of other comments on this.
12   You will also recall that many of the statements, in his
13   post-arrest statement, were, in fact, shown to be false.
14   For example, he admitted, allegedly, that he delivered
15   two kilograms of cocaine to Charles Bolden on the
16   evening of December 14.  Yet five witnesses say he was
17   at home that night.  There was a burglary at his home.
18   The jury, in fact, believed those five witnesses.
19            The defendant also claimed that he had a
20   prearranged ten kilo transaction with Tommy.  He told
21   the agents, yes, I have got it all set up, I can help
22   you guys.  That was false.  There was no prearranged
23   delivery.  He couldn't make any transaction with this
24   fellow purporting to be Tommy.
25            The law is clear that the defendant has

1   the right to be sentenced only on reliable evidence.

2   This is not such a case.  There is other statements in

3   his post-arrest statement that are inherently

4   implausible.  For example, he claims that he is a multi-

5   kilogram drug dealer yet he earns two hundred and fifty

6   dollars for every kilogram he sells.  That is a one

7   percent markup.  Again, this is a preposterous

8   statement.

9           In my written filings I mention the case

10  of United States versus Robinson where the Seventh

11  Circuit found clear error to rely on inherent and

12  unreliable statements, which if believed would have the

13  defendant's customers paying higher prices when they buy

14  larger quantities.  This Court certainly has the

15  discretion to demand that there be some reliable

16  evidence before you that this man is a multi-kilogram

17  drug dealer, besides just desperate claims from a man

18  that is locked up and trying to earn his freedom.

19          Judge, no one is saying that Ivan has not

20  made mistakes, or that he is an angel.  Clearly, he has.

21  Clearly, anyone who was hanging out with Charles Bolden

22  back in 1998 was not leading an exemplary life, the life

23  that you have seen he has been leading in the last seven

24  years.  But to sentence a person as a multi-kilo drug

25  dealer the Court should demand some solid evidence.  It

1    is simply lacking here.

2              I would ask the Court to set aside the

3    jury's five kilo finding and to sentence the defendant

4    based only on quantities that were actually proven.

5              I should say one other thing on this.

6    That is, this issue was preserved.  I know that is an

7    issue, but this issue was preserved in attorney Don

8    Levy's initial filing which was within the seven days,

9    he did raise the point that there was insufficient

10   evidence to support the jury's finding of the five

11   kilos.

12             The Court does have the power and does

13   have the discretion to set aside that finding and I

14   would urge you to do so.

15             With respect to Ivan's post-offense

16   rehabilitation.  This is what we are asking the Court to

17   consider.  A departure from the Guidelines, or an

18   argument for the Court to exercise its discretion.

19             This offense occurred in 1998, seven years

20   ago.  The defendant has been on bond for the better part

21   of six years.  On two separate occasions this Court has

22   found him worthy of the Court's trust.  I think you can

23   see from the witnesses and from the letters before you

24   that he has not let you down.  He was first on bond from

25   January of 1999 through April, 2002.  He worked as a

1    carpenter for three different companies.  He supported

2    his children.  He spent time with his children on the

3    weekends and on their vacations and in the summer.  He

4    helped organize youth activities.  He obeyed all of the

5    conditions of his bond.  In fact, in July of 2003 the

6    pretrial officer recommended termination of the

7    electronic monitor.

8             The Court will recall that in April of

9    2002 he was convicted, incarcerated for thirteen months.

10    While he was in jail there were no incidents.  I think

11    that is important, too.  No incidents, no complaints.

12    He led Bible study classes at the MCC and at the Dodge

13    County Jail.

14             After his second release, he has now

15    gotten back together with the mother of his children who

16    you heard from today.  He is supporting them,

17    emotionally and financially.  With the help of his boss,

18    he has also started his own business, which is a repair

19    business for apartment buildings.

20             Judge, you have a lot of letters before

21    you.  I actually have some more.  If I may, just to

22    highlight a couple of statements from some of the

23    letters.  I should give you these -- maybe just to save

24    them.  I can just highlight a couple of statements that

25    I would ask the Court to consider in some of these

1    letters.

2              Nora Ellington Hill says -- an outstanding

3    young man, quiet and gentle.  Derrick Ellington -- young

4    African men have few role models.  Ivan is an excellent

5    son to his mother and father to his children.  His

6    family needs him and depends on him.

7              Ivan is a role model, professional in his

8    business, fair in price and conscientious.  He is needed

9    in the community.

10             Although his life has been overshadowed by

11   his legal battles, he has nonetheless sustained an

12   honorable work ethic, and an unwavering sense of

13   commitment and responsibility to his family.

14             Diligent worker, involved with the church

15   activities.  Comes from a Christian family of working

16   class people with strong family ties.

17             Judge, I think that there is a theme from

18   these letters.  That is that the kind of person that

19   Ivan was in 1998 is not the person that stands before

20   you today.  This is an unusual situation where you have

21   seven years of experience with somebody post-offense.

22             This is a man who has completely turned

23   his life around.  He has become a productive member of

24   society.  Taking care of his children.  He demonstrated

25   his rehabilitation with deeds and not talk.  For Mr.

1  Bhachu to say that he can't see any mitigating
2  circumstances in this case, I find that to be shocking.
3  If he doesn't see it, he is unwilling to look because
4  this is a man that has turned his life around.  A prison
5  sentence at Government expense only takes from society;
6  it doesn't give.  Someone is going to have to take care
7  of his kids and his wife.

8          Also, Judge, when you see this type of
9  support for a young man, I think that can give the Court
10 some comfort that when he goes back to his community
11 there is people there to make sure that he never slips
12 up again.  These are people that are willing to stick
13 their necks out for him and they are asking your Honor
14 to do the same.

15         Thank you.

16         MR. BHACHU:  Your Honor, just a couple of quick
17 comments.

18         With respect to the extensive discussion
19 that has been had about the defendant's employment
20 record and his family ties and responsibilities.
21 Section 5H1.5 of the Guideline provides that an
22 employment record is not ordinarily relevant in
23 determining whether a departure is warranted.  Moreover,
24 in sentencing a defendant convicted of an offense other
25 than the offense described in 5H1.6, family ties and

1    responsibilities are not ordinarily relevant in

2    determining whether a departure may be warranted.

3            So when I say there aren't many mitigating

4    circumstances, I say that in light of the fact that the

5    Sentencing Commission has determined that one should not

6    get the benefit of a lower sentence based upon one's

7    family ties, responsibilities or employment history.

8    The reason that is, so that defendants in similar

9    situations convicted of similar crimes are not

10   distinguished against based on what their family

11   responsibilities are.  It is all part of a system where

12   people get uniform sentencing in this country.  Congress

13   has indicated that that is the policy it wishes to

14   pursue.

15           With respect to the statements that have

16   been made concerning Mr. Eberhardt as a role model, I

17   believe that Mr. Eberhardt's conduct speaks louder than

18   those words.  His conduct over a period of several years

19   indicates that he is not a role model.  He has not been

20   a role model in the past and should not be considered as

21   a role model.

22           There was an extensive period of time

23   spent discussing the evidence at trial.  I find it

24   regrettable that counsel continues to suggest that there

25   was not sufficient evidence in this case to convict the

1    defendant.  Regrettable because in any case that the

2    defendant still does not accept responsibility for his

3    conduct.  Regrettable because it also indicates that the

4    defense believes that law enforcement officers got

5    before this Court, took an oath and lied before this

6    Court under oath on what Mr. Eberhardt said.

7                I believe the evidence is sufficient to

8    sustain the jury's finding.  The time within which to

9    challenge that finding has long since passed.  There is

10   no basis to suggest that this Court may ignore the

11   jury's finding in deciding whether or not that the

12   mandatory minimum sentence may be imposed in this case.

13                That is all, your Honor.

14               MR. GOODMAN:  Can I make one comment?

15                While family ties are ordinarily not

16   relevant, there is case law that says extraordinary

17   post-offense rehabilitation is something that takes a

18   case out of the heartland.

19               THE COURT:  I understand.

20                Mr. Eberhardt, if you want to say

21   something before I impose sentence upon you, this is the

22   time to do it.

23               DEFENDANT EBERHARDT:  Good morning, your Honor.

24   At this time I just would like to take the time to

25   apologize to my family, my friends -- of course, I would

1   not be standing here had it not been for some bad

2   decisions and bad associations.  I have come to terms in

3   the last seven years that a lot of things can be avoided

4   because it would be easy for me to stand here and say --

5   to say that I am perfect, I didn't do it or whatever.

6   But that is in the Court records.  That is arguments

7   held for another day.

8              But what I can say is that by association

9   and by decision that I did make does have me in this

10  situation with regards to even you -- I apologize to you

11  for having to make these decisions on this day which

12  could have been avoided by different types of

13  associations.

14             I mean, I thank everybody for all of the

15  comments that they did make about me.  I have made bad

16  decisions in the past, as we all have.  I do feel,

17  myself, speaking for myself, that I am a changed man.

18  That I am a God-fearing man.  And that my children, I

19  feel they need me and I need them.  My mother, she also

20  needs me, which I don't know are factors that you take

21  into consideration on basing your decision.  But, like I

22  say, I apologize to you for putting you in this

23  position.  I apologize to my family for putting them

24  through all that I have been through in the past seven

25  years and I ask for your mercy, your Honor.

1          I thank you for hearing me.

2          THE COURT:  Let me begin with the technical

3     matters first.  That is the determination of the

4     Guideline.

5          Let me begin by saying that I don't think

6     the agents who testified lied.  But I think actually the

7     principal argument that Mr. Goodman is making is not

8     that they lied, but that what Mr. Eberhardt said cannot

9     be accepted as credible.  The reason it can't be

10    accepted as cedible is because he was under pressure --

11    legitmate pressure -- to enhance his supposed value as a

12    witness to the agents.  And this sort of exaggeration

13    has happened mnay times, if it was an exaggreation, and

14    occurs even in cases in which hthe interrogations and

15    interviews are conducted by the most professional and

16    honest of agents.  That is because the incentive does

17    not come from the agents.  It comes from the situation

18    and from an indidivudal's own perception of what he

19    needs to do.

20          So the question is, since it is, I think,

21    fairly important for the determination of the amount,

22    how much do I credit what Mr. Eberhardt did, in fact,

23    say to the agents?  The only part that I am willing to

24    credit is that he did deal in the drugs and he dealt

25    with them over a period of time.  But from the words

1  alone, I am reluctant to conclude that there is a

2  particular quantity involved, because I have to look

3  elsewhere to find the quantity.

4          The place I look to is the two actual

5  kilos, which don't add up to five kilos, but there are

6  two.  I also look to the fact that there is sufficient

7  evidence, and evidence which would persuade, I think,

8  the jury and would persuade me that there was a

9  continuing relationship with Bolden over a period of

10  time.

11          Bolden, too, I think, is fairly unreliable

12  on quantity issues and fairly unreliable in general; a

13  bad business partner.

14          The other aspects of the attack on what it

15  was that was said to the agents, I think, are accounted

16  for by a variety of circumstances.  It is true that Mr.

17  Eberhardt did not wind up with a lot of money in his

18  pocket.  But one of the great misconceptions of life is

19  that a lot of drug dealers have a lot of money.  Some

20  drug dealers have a lot of money; most don't, which is

21  why an economist from the University of Chicago has

22  noted -- many drug dealers still live with their mothers

23  and have issues of what they can afford.

24          Mr. Eberhardt's stated profits on these

25  transactions are quite consistent with his being a

1   middleman, a relatively low-level middleman.  I don't

2   find anything credible in that.

3           My belief is that the jury was justified,

4   given the evidence it heard, considering at least the

5   statements of Mr. Eberhardt, that he dealt in drugs in

6   some quantities, although not exact ones.  Considering

7   the fact that there were two actual kilograms and

8   considering the fact that there was a continuing

9   relationship, the jury was justified in finding beyond a

10  reasonable doubt that at least five kilograms had been

11  proven.  If the decision were left to me, I would find

12  five kilograms had been proven.  But I am very reluctant

13  to go up to the next level which I think is fifteen

14  kilograms.  I would be profoundly uncomfortable with

15  finding that there were fifteen kilograms -- I think

16  more than fifteen kilograms is the dividing line, which

17  means I calculate the Guidelines differently than the

18  probation report does.

19          Instead of a level thirty-six, a criminal

20  history category two, I believe I am at level thirty-

21  two, criminal history category two, because the drug

22  quantities were two levels above that, which I find to

23  have been proved.  So I am at one thirty-five to one

24  sixty-eight, as opposed to the originally suggested

25  guideline of two hundred and ten months to two hundred

1   and sixty-two months.

2          I do want to comment on the possibility of

3   departure from the Guideline.  In the context of this

4   case no departure can be very far in any event because

5   we have a ten-year mandatory minimum.  So basically it

6   is one hundred and twenty months is the minimum that Mr.

7   Eberhardt can get.  But I do want to comment on some of

8   the things said about him.

9          I received a lot of letters over the years

10   with respect to Mr. Eberhardt about his place in the

11   community and what he has done.  Basically I believe

12   them.  I don't dispute their accuracy.  Whether he did

13   this because he had a "like St. Paul saw the light while

14   riding his horse" or whether he simply was scared

15   straight is immaterial to me.  The fact of the matter is

16   he has done a pretty good job since he got caught.

17          It should be noted that in granting him a

18   new trial I did not make a finding that he was innocent

19   of these charges.  I made a finding that I thought he

20   didn't get a fair trial.  But a jury found, beyond a

21   reasonable doubt, that he was guilty.  And even if there

22   is a reversal and a new trial on appeal, another jury

23   may find the same thing because there is enough evidence

24   to justify that finding.

25          So what I am faced with is a situation

1    which the Guidelines address but which I think needs

2    some more explanation than the cold language in the

3    Guidelines.  That is what you do with somebody who

4    commits a crime, and then frequently, through no fault

5    of his own, a long period of time passes before there is

6    an adjudication and he leads a pretty good life during

7    that time.  In addition to leading a pretty good life,

8    he has people who depend on him and who will suffer if

9    he is sent away.

10           The problem with the people who suffer

11    when somebody is sent away is in the vast majority of

12    cases that is always true.  There is always the family

13    that suffers.  There are frequently children that

14    suffer.  Very few people are completely alone in the

15    world.  Congress has quite clearly dictated that that

16    fact alone does not authorize a departure, and is of

17    limited utility even in concluding what the correct

18    sentence is, absent the Guidelines.

19           The people who support him have seen that

20    he is a good father and a good friend and an honest and

21    decent businessman.  Most people who see this in other

22    persons are quite convinced that this is evidence of

23    their innocence of a variety of things.  But those of us

24    who have spent, by choice or by fate, a significant

25    number of years in the field of criminal justice know

1    that distressingly often you will find, even in the

2    worst criminals, good fathers, good friends, honest

3    workers.  I have seen serial killers who fit that

4    description.

5              This doesn't mean that being a good father

6    and a good friend is irrelevant.  It simply tells us

7    that it does not mean that they have not transgressed

8    the criminal law.

9              Another thing that I think is a persistent

10   problem, and it doesn't simply apply to Mr. Eberhardt,

11   it applies to a lot of people in the world, it applies

12   to maybe ninety percent of the people who are sentenced,

13   who talk about making mistakes.  I don't know how the

14   word "crime" got translated and changed into the word

15   "mistake".  But a mistake occurs frequently when you run

16   through a red light, when you add up a column of figures

17   wrong.  But what we are dealing with here is not

18   mistakes; this is a crime.

19             While we always look to the future when we

20   sentence, the basic reason we sentence is to adjust the

21   balance, the social balance that has been disturbed by

22   the commission of a crime.  And, in a sense, to face it

23   quite clearly, there is an element of retribution, of

24   judgment and retribution in all criminal sentences.

25             I basically adhere to my view, which I

1    expressed in an opinion, that the defendant ought to
2    have a new trial in this case for the three reasons that
3    I gave in my opinion.  Perhaps if all, of the two issues
4    that the Court of Appeals said were not properly
5    preserved, turn out to be available on appeal, that will
6    be the result -- maybe not.  They have a higher Court
7    and they don't have to agree with me.  But the fact is
8    that I am sentencing him today based on the presumption,
9    which I fully accept, that the jury verdict is correct,
10   supported by evidence beyond a reasonable doubt.  And it
11   is on that basis that I will impose the sentence.
12               Mr. Eberhardt, do you want to step
13   forward, please.  I sentence you to one hundred and
14   thirty-five months in the custody of the Bureau of
15   Prisons.  That is to be followed by a term of supervised
16   release of ten years.  Because of the nature of family
17   obligations, I am waiving any fine, even though I
18   believe you probably have the economic ability to do so.
19   In that sense, I believe I do have the power to depart
20   from the fine on the grounds of family needs.  There is
21   no restitution.  I am assessing one hundred dollars.
22               The special conditions of supervised
23   release are that he report to the Probation Office in
24   the District in which he is released within seventy-two
25   hours of his release.  Let me restate that.  He is to

1    report to the Probation Office in the District to which

2    he is released within seventy-two hours of his release.

3    He may not commit another offense.  Shall follow the

4    standard conditions.  May not possess a firearm or

5    destructive device.  He shall refrain from any unlawful

6    use of a controlled substance and shall participate in

7    drug and alcohol aftercare treatment which may include

8    testing at the direction of the Probation Officer.

9              With that, I will explain to you, Mr.

10   Eberhardt, that you do have the right to appeal the

11   sentence.  In fact, to appeal the conviction.  If you

12   want to do that, you will have to tell Mr. Goodman and

13   he will tell you how to go about doing that.

14             That then leads to the final motion Mr.

15   Goodman has filed, which is a motion for release on bond

16   pending appeal.  I have read the motion, so the US

17   Attorney can respond to that.

18             MR. BHACHU:  Your Honor, my recollection is

19   that the last time the defendant, when the defendant was

20   convicted, his bond was revoked.  I believe there is a

21   presumption in this case, due to the term involved here,

22   that he should be taken into custody.  The issue that

23   has been raised in the motion is that it is likely that

24   this case will result in reversal on appeal and

25   conviction.  Judging by the opinion that was issued by

1    the Seventh Circuit in this case, on our most recent

2    appeal, I believe that to be highly unlikely.  With all

3    due respect, I believe that the Seventh Circuit

4    addressed this issue about the prospect for error and

5    its effect on this trial and it has well indicated that

6    there was no error in this case that would be sufficient

7    to call for a new trial.

8            With respect to the issue of the statement

9    relating to "E" coming into evidence, the Seventh

10   Circuit made note of the fact that the defense counsel

11   actually noted that Eberhardt was the individual who Mr.

12   Bolden was calling.  The Seventh Circuit also noted that

13   there was no Crawford problem in this case whatsoever in

14   its opinion.

15           With respect to the issue of the buyer-

16   seller instruction, this Court suggested that it was

17   perhaps appropriate to issue a buyer-seller instruction.

18   However, the defense at trial, as it appears that it is

19   today, is that the defendant was an innocent bystander.

20   Clearly a buyer-seller instruction, which was never

21   asked for at trial, would be inappropriate and there

22   would be no appeal justifying reversal for the failure

23   to give a buyer-seller instruction where it would be

24   inconsistent with the theory of defense.

25           In short, it would be highly unlikely,

1   given the only probable issue on appeal is the

2   sufficiency of the evidence.  The standard which is, I

3   recall, one must show -- the Seventh Circuit has said

4   that a sufficiency claim is one in which the defendant

5   faces an almost insurmountable burden on appeal.  Given

6   that that is the standard the defendant faces, it is

7   highly unlikely that this conviction will result in a

8   reversal on appeal.  Because of that, and because that

9   is the standard this Court must consider in deciding

10  whether or not to release the defendant on bond pending

11  appeal, the motion should be denied.

12        THE COURT:  Mr. Goodman, before you respond, I

13  do want to say that with respect to the statute 3143(b),

14  subsection (a), I regard it as shown by clear and

15  convincing evidence that he is not likely to flee.

16        MR. GOODMAN:  Thank you.

17        THE COURT:  And by clear and convincing

18  evidence that in his current lifestyle, not likely to

19  pose a danger to the safety of any other person or the

20  community.  So the issue is basically the meaning of the

21  appeal not being for the purposes of delay, which I

22  think is also shown.  But the other condition, which is

23  the one the prosecutor has argued against, is that I

24  ought not to find that the appeal raises a substantial

25  question of law or fact likely to result in an order for

1    a new trial -- which is the one that would apply here.

2    MR. GOODMAN:  As your Honor correctly noted,

3    the Seventh Circuit found only one of the issues

4    preserved for appeal.  It then made what I consider to

5    be -- it didn't consider the other two issues on the

6    merits.  It didn't perform any analysis.  It issued what

7    I considered to be somewhat gratuitous remarks saying --

8    don't get your hopes up -- which I suppose is reasonable

9    because most cases are affirmed on appeal.  I appreciate

10   those remarks, but I think when the Court does consider

11   the issues -- I just want to address the Crawford error.

12   The Seventh Circuit has, since Crawford,

13   decided at least three cases where it strictly applied

14   Crawford.  One of them I cited in my papers.  The other

15   two are --

16   THE COURT:  Let's stop for a second.

17   Leaving aside Crawford and Washington, and

18   leaving aside the issue of retroactivity, although it is

19   fairly clear to me that on direct appeal it will be

20   retroactive.

21   The point of view I took with respect to

22   that, before Crawford and Washington, is it is a problem

23   with that evidence under Ohio and Robertson, even the

24   more permissible rule.  Even in that respect you don't

25   have to persuade me that the issue you raised has

1   substantial merit.  What you have to respond to is what

2   you are responding to, which is the point of the

3   prosecutor that you can interpret the Court of Appeals'

4   opinion as throwing a fairly large bucket of cold water

5   on the chances of a new trial on appeal.

6        MR. GOODMAN:  I think that is correct.  I think

7   it was a one-sentence shot at our chances of prevailing

8   on that ground.  But again there is no analysis.  So I

9   think the Seventh Circuit is issuing a considered

10  opinion based on experience that you are not going to

11  win this appeal without actually having done the work.

12  I think if you look at the one case, United States

13  versus Silva, which is a 2004 case, and it is a

14  remarkably similar case.  It is an opinion by Judge

15  Easterbrook.

16            In that case the defendant was charged

17  with a drug conspiracy.  At trial, the Government agent

18  testified about conversations between the nontestifying

19  confidential informant and a supplier, wherein they

20  named the defendant.  In their conversation, they talk

21  about the defendant as the person who is going to make

22  the delivery.  The Government contended that this

23  evidence was admissible to show the actions taken by the

24  witness.  The exact same explanation the Government had

25  in this case.  The reason they put it in is to show why

1    the agents then attempted to set up Mr. Eberhardt.   The

2    District Court overruled the defense's objections.

3              THE COURT:   I am actually familiar with the

4    case.

5              MR. GOODMAN:   Then your Honor is familiar with

6    the fact that the Seventh Circuit rejected that

7    argument.

8              THE COURT:   Let me tell you what my view is.

9              "Likely to result" is a term of art in the

10   law.  We use "likelihood of success" in injunctive

11   cases.  It usually doesn't mean, shown by a

12   preponderance of the evidence that you are going to

13   succeed.  It is usually interpreted to mean that you

14   have got a demonstrably good chance.  I think that that

15   is true in this case because I read the opinion

16   differently than either of you do.  Perhaps because on

17   occasion I have sat on an appeal.

18             You have on appeal a decision by a

19   District Judge that a new trial was warranted for three

20   errors.  I was very clear in my opinion and the Court of

21   Appeals correctly took me at my word that one of them

22   alone would not do the trick.

23             The reason they reversed my finding is

24   because only one of the issues was properly before me.

25   The other two had failed because they were raised too

1    late in the process, and the process in which in the

2    criminal law is fairly rigid, the timing.

3            They also did that in a situation in which

4    the Government had not raised the preclusion of the

5    grounds before me.  When you are sitting on the Court of

6    Appeals and you have a case in which a ground not raised

7    below is cause for reversal -- particularly in a

8    criminal case where a new trial has been granted -- most

9    Judges believe that one ought to explain to the

10   litigants at least why it is that this decision

11   reversing the new trial on a mere technically -- it was

12   your classic mere technicality -- is not a patent

13   injustice.  One of the ways to point this out is to say,

14   it might well have not made a difference even if the

15   issues had been before you.  I think that is the point

16   they were making.

17           My view is, assuming all three issues are

18   properly preserved for appeal, it is still quite

19   conceivable that the Court of Appeals will disagree with

20   my judgment.  And it is their judgment that controls,

21   not mine.

22           But I do believe that within the meaning

23   of "likely" as expressed in this statute, there is in my

24   judgment a substantial question of law "likely", as I

25   define it, to result in an order for a new trial.

1          So the motion for bond pending appeal is

2   granted.

3          MR. GOODMAN:  Thank you.

4          THE COURT:  The Government, of course, is free

5   to raise this issue again with the Court of Appeals,

6   which may be in a better position than I am to tell us

7   exactly what it is they meant in their opinion.

8          I see no reason not to continue with the

9   same bond that exists, although if the Government wishes

10  to add additional conditions -- the Government is

11  indicating it does not wish to do so.

12         MR. BHACHU:  No, your Honor.

13         THE COURT:  Therefore, the motion for bond on

14  the appeal is granted and the same bond will continue.

15         Thank you.

16         MR. BHACHU:  Thank you, your Honor.

17         DEFENDANT EBERHARDT:  Thank you, your Honor.

18         MR. GOODMAN:  Just one other matter.  Mr.

19  Eberhardt has filled out a financial affidavit.  His

20  family, they have no more funds for counsel.  I would

21  ask the Court -- I am not asking for any fees for this

22  proceeding, but for the appeal.  I don't know what the

23  procedure is, actually.

24         THE COURT:  I believe what I do is I will

25  appoint you for purposes of filing the notice of appeal

51

1    and for applying to the Court of Appeals for

2    appointment.

3              MR. GOODMAN:  Thank you.

4              THE COURT:  Or at least that somebody be

5    appointed.  I am satisfied with the financial affidavit

6    which has just been handed up to me.

7                   Thank you.

8              MR. GOODMAN:  Thank you.


                   I certify that the foregoing is a correct
transcript of the original shorthand notes of
proceedings in the above-entitled matter.


_____          _____
Anthony W. Lisanti                   Date
Official Court Reporter